42585.   BLACKBURN v. HALL et al.

236

ARGUED JANUARY 3, 1967—DECIDED JANUARY 25, 1967—
REHEARING DENIED FEBRUARY 17, 1967

*Charles D. Read, John C. Hunter, A. Mims Wilkinson, Glenville Haldi,* for appellant.

*Hamilton Lokey, Eugene T. Branch, Earle B. May, Jr.,* for appellees.

EBERHARDT, Judge. This is an appeal of the overruling of a general demurrer to a petition brought under the Election Code by twelve electors residing in the 4th Congressional District contesting on behalf of James A. Mackay, the candidate of the Democratic Party, the result of the general election held November 8, 1966, in which Benjamin B. Blackburn, III, the Republican candidate, was the apparent winner, and seeking a recount of all votes cast by the votomatic process in Fulton and DeKalb Counties, particularly (a) the ballots deleted by the computer as not having been cast for either candidate in the election, (b) the defective ballots which the computer could not process and which were duplicated by election officials for counting, and (c) the "over-vote," wherein there was a voting of a straight party ticket (Democrat or Republican) and a vote for the opposing candidate in the Congressional race.

■ The question raised by appellees' motion to dismiss is whether the appeal is premature, in the light of §§ 34-1708 and 34-1709 of the Georgia Election Code (Ga. L. 1964, Ex. Sess., pp. 26, 183-184), requiring a final determination of the matter as a basis of appeal. The overruling of a general demurrer is, of course, not a "final determination."

But appellant contends that the above provisions of the Election Code have been superseded by the Appellate Practice Act of 1965 (Ga. L. 1965, p. 18), which allows an appeal from an order which would have been final if it had been rendered as contended for by him. If the demurrer had been sustained it would have terminated the proceeding, and thus have been final.

In interpreting the intent of the legislature with regard to the sweep of the Appellate Practice Act of 1965, this court stated: " 'This Act being intended as a comprehensive revision of appellate and other post trial procedure, the failure to specifically enumerate any statute, Code section or Act dealing with a matter covered hereby shall not be construed as continuing such Code section, statute or Act in effect, and to this extent the doctrine of expressio unius est exclusio alterius shall not apply,' and Section 25 provides that 'All laws and parts of laws in conflict with this Act are hereby repealed.' These provisions make it clear that the legislative intent was to provide a uniform post-trial procedure in all courts of this State from which a writ of error would lie to the Supreme Court or the Court of Appeals at the time of the passage of the Appellate Practice Act." *White Oak Acres v. Campbell,* 113 Ga. App. 833, 834-835 (149 SE2d 870).

It is contended however that the 1965 Act is inapplicable to an election contest for the reason that the same is "not an action at law or a suit in equity" but rather a "special statutory proceeding." *Harris v. Sheffield,* 128 Ga. 299 (57 SE 305). We agree that an election contest is "a special statutory proceeding"; however, this court has held in another case involving "a special statutory proceeding" (workmen's compensation) that the special appellate procedure and practice found in *Code* § 114-710 was supplanted by the Appellate Practice Act of 1965. *Peters v. Liberty Mut. Ins. Co.,* 113 Ga. App. 41 (1) (147 SE2d 26). There are many more "special statutory proceedings" that are analogous but are too numerous to even mention.

It is further contended that the 1965 Act is limited to civil and criminal cases and that an election contest is neither. The specific answer to this can be found in the very section of the Election Code relied on by the appellees. It provides that appeals shall be taken "as in *other* civil cases." *Code Ann.* § 34-1709. (Emphasis supplied). In view of this language it would seem a bit illogical to contend that the legislative intent was that an election contest was not a civil case.

We think the ultimate statement on this question is found in *Undercofler v. Grantham Transfer Co.,* 222 Ga. 654, 657 (151

SE2d 765). In dealing with the same question which we have before us in this case—possible exceptions to the reviewability of an order under the Appellate Practice Act of 1965—the Supreme Court held: "It therefore appears the legislature in excepting the three classes of cases (mandamus, quo warranto and writ of prohibition) from the operation of Section 1(a)(2) of the 1965 Appellate Practice Act intended it to apply to all other cases, . . ."

■ ■ Did the trial court have jurisdiction of the subject matter? If it did not, the general demurrer should have been sustained for that reason.

Article I, Section 5 of the Constitution of the United States provides: "Each House shall be the judge of the Election, Returns and Qualifications of its own members. . ." This may suggest a preemption of the subject matter by the Congress and a resulting lack of jurisdiction in the courts.[1] How-

---

[1]The decisions of courts in some of the states contain language that would lead to this conclusion. E.g., see McLeod v. Kelly, 304 Mich. 120 (7 NW2d 240); Smith v. Polk, 135 Ohio St. 70 (19 NE2d 281); In Re Opinion of Justices, 80 N. H. 595 (113 A 293); Britt v. Board of Canvassers, 172 N. C. 797 (90 SE 1005). Federal courts have disclaimed jurisdiction in this area. See Application of James, (DC, NY) 241 FSupp. 858; Peterson v. Sears, (DC, Iowa) 238 FSupp. 12. But in none of these cases was the question dealt with in relation to a state election law providing for a recount, as here. See Anno. in 107 ALR 205 and in 68 ALR2d 1320. In Barry v. Cunningham, 279 U. S. 597, 619 (49 SC 452, 73 LE 867), it was asserted that "The Senate, having sole authority under the Constitution to judge of the elections, returns and qualifications of its members, may exercise in its own right the incidental power of compelling the attendance of witnesses without the aid of a statute." Again, however, the court was not dealing with the question here, but with the power of a Senate Committee inquiring into expenditures made by or in behalf of the candidate in the election to subpoena witnesses, and the power of the court to punish a recalcitrant witness for contempt. In Laxalt v. Cannon, 80 Nev. 588 (397 P2d 466) after a recount had been completed a contest was filed originally in the Supreme Court. See also 26 AmJur2d 151, Elections, § 330.

ever, in a well-reasoned opinion the Supreme Court of Oklahoma reached a contrary conclusion in Wickersham v. State Election Board, (Okla.) 357 P2d 421, holding that "where the right to a recount of votes cast for a particular office is not granted by statute, a proceeding that has for its purpose the matter of recounting the votes in fact 'constitutes a challenge to the title to the office' . . . and is therefore in effect an action in the nature of quo warranto to try the right or title to the office. In such cases all of the election processes have been carried out before the proceeding is filed and for said reason Congress alone has exclusive jurisdiction and it alone can grant relief. On the other hand, where, as a part of the election proceedings, a recount is provided for in proper instances, an election cannot be considered as over or final until a recount is allowed, and until the election is final, the courts can and should exercise jurisdiction for the purpose of requiring lower tribunals to comply with the election statutes."

The Supreme Court of Minnesota employed similar reasoning in Odegard v. Olson, 264 Minn. 439 (119 NW2d 717), pointing out that there had been no statutory provision for contesting the count of ballots when a contrary result was reached in Youngdale v. Eastvold, 232 Minn. 134 (44 NW2d 459), Williams v. Maas, 198 Minn. 516 (270 NW 586), and State ex rel. 25 Voters v. Selvig, 170 Minn. 406 (212 NW 604). And see Ransley's Contested Election, 268 Pa. 303 (111 A 876), where jurisdiction was held lacking because of the absence of any statutory authorization of the contest.

Since a contest of this nature is specifically authorized by the Georgia Election Code of 1964, § 34-1701 et seq., we conclude that the courts of this State have jurisdiction of a proceeding brought under the provisions of the Code to obtain a recount of all or a portion of the ballots cast in an election for a representative to either House in the Congress.

We share the sentiment expressed by the Supreme Court of Oklahoma concerning the proposition that the Congress might refuse to seat a contestant although a recount should disclose that he had received the greater number of votes. Said the court: "Although Congress may have such power, we do not

agree with [the] suggestion that to accept jurisdiction herein and grant relief we will be doing a vain or futile thing. We are not convinced that Congress will refuse to recognize the result of a recount or a Certificate of Election issued in accordance with the recount. If we entertained doubt on said score, we nevertheless would be of the opinion that the respondents are under a duty to comply with the election laws, and since respondents have failed to comply with said laws by granting a recount, we are under a duty to direct respondents to grant a recount." 357 P2d 421, supra. In the situation here, if there are votes which have not been counted and which under the Georgia Election Code are entitled to be counted and included in the totals, a recount should be had for that purpose. We know of no better means of securing observance of our election laws than to require them to be applied and enforced as written. The courts are empowered to determine whether that has been done. Jurisdiction is clear. Its exercise is neither officious nor nugatory.

■ This brings us to a consideration of whether, for other reasons, there was error in the overruling of the general demurrer to the petition. As has been indicated, the count or tabulation of the votes is urged to be erroneous in three areas or respects. In the consideration of these we should have in mind, in addition to the applicable provisions of the Election Code, a general principle that there is a distinction between the errors of officers conducting elections and errors of the voters themselves; in the former case, since the voter has no power over the officer, the officer's blunder will not disfranchise the voter— unless it is mandatory under the law, whereas the voter may *by his own neglect* disfranchise himself. McCrary on Elections, § 724; Morris v. Board of Canvassers of City of Charleston, 49 W. Va. 251 (38 SE 500).

Each of the parties urges as the most important of the considerations raised the matter of the "over-votes." It is alleged that there are numerous instances where the voter punched the ballot in the indicated space opposite the name of the candidate for Congress on the ticket of the opposing party, both parties having candidates for that office.

These ballots were thrown out by the computer and were not included in the tabulation by the election officials because, as they construed the matter, there was a vote for both candidates for the same office. Contestants contend that this was an erroneous construction of the ballot; that in truth and in fact the voter had intended to vote for all candidates of the party for which he had indicated a vote save and except its candidate for Congress, and that he had intended to vote for the candidate of the opposition party for that office—and that these votes should be so counted and tabulated.

Let us first look to applicable provisions of the Election Code.

The only provision by which the voter is instructed as to how he should prepare and cast his vote in an election is found in § 34-1314 (c): "At elections, the elector shall prepare his ballot in the following manner: He may vote for the candidates of his choice for each office to be filled according to the number of persons to be voted for by him for each office by making a cross (✕) or check (✓) mark in the square opposite the name of the candidate, or he may write, in the blank space provided therefor, any name not already printed on the ballot, and such insertion shall count as a vote without the marking of a cross (✕) or check (✓) mark. *If he desires to vote for every candidate of a political party or body, he may make a cross (✕) or check (✓) mark in the square opposite the name of the party or body of his choice in the party or body column on the left of the ballot, and every such cross (✕) or check (✓) mark shall be equivalent to and be counted as a vote for every candidate of a party or body so marked.* If he desides to vote for the entire group of presidential electors nominated by any party or body, he may make a cross (✕) or check (✓) mark in the appropriate square at the left of the names of the candidates for President and Vice President of such party or body. In case of a question submitted to the vote of the electors, he may make a cross (✕) or check (✓) mark in the appropriate square opposite the answer which he desires to give." (Emphasis supplied.)

Provision for the counting of ballots is made in § 34-1322: "(a) Any ballot marked so as to identify the voter shall be

void and not counted, except a ballot cast by a challenged elector whose name appears on the electors list; such challenged vote shall be counted as prima facie valid but may be voided in the event of an election contest. Any ballot marked by anything but pen or pencil shall be void and not counted. Any erasure, mutilation or defect in the vote for any candidate shall render void the vote for such candidate, but shall not invalidate the votes cast on the remainder of the ballot if otherwise properly marked. If an elector shall mark his ballot for more persons for any nomination or office than there are candidates to be voted for for such nomination or office, or *if, for any reason, it may be impossible to determine his choice for any nomination or office, his ballot shall not be counted* for such nomination or office, but the ballot shall be counted for all nominations or offices for which it is properly marked. Ballots not marked, or improperly or defectively marked so that the whole ballot is void, shall be set aside and shall be preserved with the other ballots.

"(b) At elections, any ballot marked by any other mark than a cross ($\times$) or check ($\sqrt{}$) mark in the spaces provided for that purpose shall be void and not counted: Provided, however, that no vote recorded thereon shall be declared void because a cross ($\times$) or check ($\sqrt{}$) mark thereon is irregular in form. *A cross ($\times$) or check ($\sqrt{}$) mark in the square opposite the name of a political party or body in the party or body column shall be counted as a vote for every candidate of that party or body so marked.* Any erasure, multilation or defective marking of the straight party or body column at general elections shall render the entire ballot void, unless the elector has properly indicated his choice for candidates in any other column, in which case the vote or votes for such candidates only shall be counted. Any ballot indicating a write-in vote for any person whose name is not printed on the ballot shall be counted as a vote for such person, if written in the proper space or spaces provided for that purpose, whether or not a cross ($\times$) or check ($\sqrt{}$) mark is placed before the name of such person." (Emphasis supplied.)

It is true that these sections refer to voting by paper ballot,

but there is no reason that we can see for having a separate rule (not spelled out in the Code) for preparing and casting ballots by use of the vote recorder or votomatic. Rather, it is in the interest of both the candidate and the voter to have a rule of uniformity so that voters moving from a paper ballot area into a votomatic area, or vice versa, or a voter from a votomatic area who casts an absentee ballot, will not be confronted with the confusing and illogical change. Moreover, these directions as to how a voter should mark his ballot and as to what ballots shall or shall not be counted, though specifically referring to the paper ballot, are declarations of public policy by the legislature.

There are provisions in the Code as to how the votomatic or vote recorder shall be set up for use in voting, going to the mechanical process of preparing it for use in casting the ballot— but which do not provide as to how the ballot shall be marked, or what ballots shall be counted except the inferential provision against the counting of over-votes.

Section 34-1220(b) provides, relative to the use of vote recorders (votomatics) that: "It shall permit each elector, at other than primaries, to vote a straight party or body ticket in one operation, and, . . . in one operation, to vote for all of the candidates of one party or body for every office to be voted for, except those offices as to which he votes for individual candidates."

Section 34-1220 (e) as amended provides that: "When [the vote recorder or votomatic process is] used in conjunction with a tabulating machine, it shall preclude the counting of votes for any candidate or upon any question, for whom or upon which an elector is not entitled to vote, and shall preclude the counting of votes for more persons for any office than he is entitled to vote for, and shall preclude the counting of votes for any candidate for the same office or upon any question more than once."

The Election Code was amended in 1965 (Ga. L. 1965, p. 226). The purpose of the amendment, as stated in the caption, was "to amend the Georgia Election Code . . . [so as] to provide that no vote recorder shall be adopted or used in

this State unless it shall, when used in conjunction with a tabulating machine preclude the counting of votes for any candidate or upon any question for whom or upon which an elector is not entitled to vote, and shall otherwise preclude the counting of over-votes. . ." The amending Act provided in the body thereof that: "Section 2. Subsection (e) of Section 34-1220 of the said Georgia Election Code, relating to the requirement that a vote recorder shall preclude an elector from over-voting, is hereby amended by striking such subsection (e) in its entirety and inserting in lieu thereof a new subsection (e) to read as follows: '(e) When used in conjunction with a tabulating machine, it shall preclude the counting of votes for any candidate, or upon any question, for whom or upon which an elector is not entitled to vote, and shall preclude the counting of votes for more persons for any office than he is entitled to vote for, and shall preclude the counting of votes for any candidate for the same office or upon any question more than once.' "

What does the clause, "and shall preclude the counting of votes for more persons for any office than he is entitled to vote for" mean? And what was the purpose of the General Assembly in the adoption of this amendment to the Election Code? We are of the opinion that it is stated in the caption of the amending statute and in the statute itself—"to preclude an elector from over-voting," and to preclude the counting of "over-votes."

Then what is an "over-vote?" Authorities are not in harmony on this problem. "According to one view, the general intention to vote a straight ticket by placing a cross in the circle at the end of a party ticket is controlled by making cross marks opposite the names of candidates on another ticket, at least where the names of the candidates in the party column opposing those candidates individually voted for are erased, and such a ballot should be counted only for the candidate or candidates on the ticket marked with a cross at the top whose opponent or opponents have not been voted for by placing cross marks opposite their names." 29 CJS 525, Elections, § 182. However, it is further pointed out that "Some statutes are so

construed that the making of a cross in the circle at the head of a party ticket is equivalent to voting for all the candidates of that party, even though cross marks are placed after the names of candidates on other columns, or the making of cross marks in the voting spaces opposite the names of candidates on other tickets is held simply to neutralize the marking so that the vote cannot be counted for either candidate, at least where the name of the candidate in the party column voted for has not been erased[2]; and, where this rule obtains, the only way to vote a split ticket is to make cross marks in voting spaces opposite all the candidates for whom the elector wishes to vote. In other words, when each column on the ballot contains names of candidates for all the offices to be filled or voted for, when the voter marks a cross in the circle at the head of a party column he has exhausted his privilege of voting and cannot vote for any other person in another column.

"However, the rule is inapplicable when the party has no candidate for the office to be filled, and where the party column, in the circle at the head of which the voter makes a cross mark, contains the name of only one candidate for an office, whereas two are to be elected, he may properly mark a cross opposite the name of a candidate on another ticket, as he is entitled to vote for two candidates." Ibid, p. 526.

Every judge on this court participated in the election here involved, some as candidates—all as voters, some voting by paper ballots, some by votomatic, and we may take judicial notice that the State Election Board, whose duty it was to administer the Code and to instruct the officials holding elections over this State as to the manner in which voting should be done and what votes were to be counted and tabulated under the provisions of the Election Code, publicized by all available means what it regarded as the proper manner of splitting tickets, including publicity at the polling places, viz., that if a voter intended to vote a split ticket he should not put a cross in the circle or indicated space at the head of a party ticket, or punch the space on a votomatic ticket, but should proceed to

---

[2]Erasures are not possible in the votomatic process.

split the ticket by making proper marks or punches in indicated spaces opposite the name of every candidate for whom he wished to vote or for whom he wished to write in a vote. We have no doubt that a great deal of ticket-splitting was done in that manner. That was the interpretation given the Code provisions by the State Election Board, and it is the view we entertain of the matter.

An "over-vote," then, occurs when the voter appropriately marks the indicated space at the head of a party column on a ballot, indicating an intention to vote for all of that party's candidates, and also places marks opposite the names of an opposing candidate or candidates, indicating an intent to vote also for them, or when he marks a straight party ticket and additionally writes in the name of a candidate for one of the offices for which there is a candidate by that party. Where an over-vote has occurred, as to that office, or those offices, the ballot is invalid, but it is valid as to others. And of course, *as to the offices for which the party has no candidate,* he may vote a straight party ticket and for individuals who are candidates of another party, or who are "write-ins," without over-voting.

The 1965 amendment to the Election Code was intended to invalidate over-votes and prevent their counting and tabulation, because that kind of ballot is ambiguous. The true intent of the voter cannot be known. Assuming that there was no intention to vote for both candidates, he may have intended to vote only a straight party ticket, and then on reflection have decided to do otherwise, or he may have started out to vote for the individual candidate of a particular party and then, on reflection, have decided to vote the straight ticket of the opposing party, or he may have intended to vote for all nominees of the designated party save the one for the office where he indicated a vote for an opposing candidate. But it is speculative for us to say what his intention was. Unless the ballot clearly demonstrates the voter's intention those who are charged with the counting and tabulation of ballots should not be called upon to surmise as to what the intent may have been— for they may well come to the wrong conclusion. It is the

duty of the voter—the elector—to make his intention clear and certain, upon pain of having the vote cast out if that does not appear. It is better that his vote fail than that it be counted for the party against whom he intended to vote, or against a party for whom he intended to vote.

Of course this is not to say that if the legislature had clearly spelled out in the law that an over-vote cast in the manner of those here is lawful and shall be counted for the candidate of the opposing party (or for a write-in, if that is the indication) a voter would be presumed to have voted with that provision in mind and his intent would be clear. But our statute does not so spell it out, and, as we see it, does not authorize the casting of an over-vote; rather it prohibits and forbids the counting of them.

Any contention that the invalidating of over-votes should result in the call of another election is without merit. The Code does not contemplate or provide for the calling of another election because ballots which the voter has improperly marked and cast are invalidated. If it did, the process of holding an election would never end, for an election has been rarely held when some of the ballots were not so invalidated. Invalidation is necessary so that the result may be determined upon the counting of ballots lawfully prepared and cast. No fraud is charged.

There is no decision from the appellate courts of this state dealing with the problem now confronting us, and we have found none from the courts of other states dealing with the splitting of tickets under the votomatic system of voting. The cases cited in Judge Deen's dissent are inapposite. All of them deal with balloting by paper ballots, but they are distinguishable for other reasons. In Pires v. Bracken, 412 Ill. 416 (107 NE2d 706) it was pointed out that "the Democratic column did not contain a nominee for every office to be filled. Three circuit judges were to be elected, and there was only one Democratic candidate. By marking the circle at the head of the Democratic column, the voter cast a vote for only one of the offices of circuit judge. Two remained to be voted on, and none of the ballots in question contained marks at more than two of the

names on the Republican ticket." Consequently, there was no over-voting in that case. In Opening of Ballot Box in Third Election Dist. of Forty-First Ward, 328 Pa. 535 (195 A 890) a statute of Pennsylvania provided that when the voter marked with a cross (×) mark at the head of a political party column he was deemed to have voted for all candidates of that party, "*except* for those offices as to which the voter has indicated a choice for individual candidates of the same or another party or body in any office block, *in which case the ballot shall be counted only for the candidates thus individually marked, notwithstanding the fact that the voter has made a mark in the party column. . .*" (Emphasis supplied).

State ex rel. Hammond v. Hatfield, 137 W. Va. 407 (71 SE2d 807) dealt with ballots in a city election with irregular markings of various kinds. With many citations of the law of West Virginia by article, chapter and section, but without giving it even in substance save in one or two instances, the court proceeded to hold some of the ballots valid and some void, concluding that "After all is said and done, the intention of the voter, when ascertainable, is the prime consideration on the question whether the ballot should be counted or discarded, and, if counted, for what candidate or candidates." With that statement we are in accord, but do not think the intention is ascertainable in the case of an over-vote. In State ex rel. Bumgardner v. Mills, 132 W. Va. 580 (53 SE2d 416), another West Virginia case, it is pointed out in the case of the over-vote the voter had scratched out the name of the party candidate in the column of the party ticket which he had voted, and had, for that office, voted for an opposing individual candidate.

State ex rel. Robeson v. Clark, 28 Wash.2d 276 (182 P2d 68) deals with a statute providing that "If [the elector] desires to vote for all the candidates of any political party he may mark a cross 'X' after the name, against the political designation of such party, and shall then be deemed to have voted for all the persons named as candidates of such party. If he desires to vote for any particular candidate of any other political party he may do so by placing after the name of such candidate a

mark 'X'. . . There was no over-voting involved. Where there had been ticket-splitting the voter had voted for the party of his choice and for candidates of another party only for offices for which his party had no candidate.

In Denny v. Pratt, 105 Conn. 256 (135 A 40) a statute provided that: "[W]here an elector has made a cross-mark 'X' in the circle at the head of any party column, and also made a cross-mark 'X' in a voting space at the left of the name of any candidate in any other column on the ballot, *such ballot shall be counted for the candidate opposite whose name such cross-mark 'X' shall have been placed, and for all the candidates in the party column at the head of which a cross-mark 'X' has been placed, except any candidate for an office for which the name of the candidate has been marked in another column*. . ." As we see it, our statute provides just the contrary.

Consequently, if this were the only issue raised by the petition the general demurrer would be good and it would have been error to overrule it.

But there are other issues raised which cannot be resolved on demurrer, viz., whether the ballots rejected by the computer as not having been cast for either candidate were, for some reason—perhaps mechanical—improperly rejected, and whether the defective ballots were properly duplicated for counting in accordance with provisions of the Code. These are factual issues, and because they are made the overruling of the demurrer was proper.

*Judgment affirmed. Bell, P. J., Frankum, P. J., Jordan, Hall and Pannell, JJ., concur. Quillian, J., concurs in the judgment. Felton, C. J., and Deen, J., dissent.*

QUILLIAN, Judge, concurring specially. Though I am unable to concur in all of the legal conclusions expressed in the majority opinion, I concur in the judgment.

FELTON, Chief Judge, dissenting. I dissent from Division 2a of the majority opinion for the reason that neither the trial court nor this court has jurisdiction of the merits of this case. This court has the limited jurisdiction in this case to adjudicate that the trial court and this court have no jurisdiction of the

merits of this case and to reverse the judgment of the trial court on the sole ground that it was and is without jurisdiction of the case. If the Georgia Election Code is construed to mean that Georgia courts have jurisdiction over a State-authorized contest of the election of a Congressman for any other purpose than a *State purpose* it is contrary to the provision of the Constitution of the United States which states: "Each House shall be the judge of the Election, Returns and Qualifications of its own members. . ." The majority's footnote No. 1 cites various authorities which it is not necessary to repeat. These authorities state the law as I see it. If the Constitution of the United States means what is said in plain and unambiguous language, neither one State nor all 50 States can change the meaning and effects thereof *by enacting laws providing for election contests.* Such action would nullify the foregoing constitutional provision and therefore be unconstitutional. If the ruling of the majority means that the trial court must recount the votes and determine for whom the questioned ballots were cast and declare the winner for the edification and information of Congress, which is under no duty to agree with or follow, it is erroneous because the Election Code is unconstitutional as construed by the majority. If it were so held, the trial court would have no jurisdiction to try the contest and render what would amount to an advisory opinion to Congress. There is no authority of law for a State court to take jurisdiction of a case at the State's expense and render a judgment which binds nobody and only serves as information for Congress, if Congress decides to accept it only as information. We have been cited to no authority for the proposition that Congress is bound by the rulings of a State court in a Congressional election contest to any degree.

The argument that Congress or the Senate might act arbitrarily or even dishonestly is irrelevant, totally and completely. See also, Laxalt v. Cannon, 80 Nev. 588, supra. See especially *Rainey v. Taylor,* 166 Ga. 476 (143 SE 383). . I do not agree with the ruling in that case but I am bound by it. My opinion is that courts have jurisdiction of the qualifications of a member of the General Assembly when it appears that the qualifi-

cations are stated in express terms in the Constitution itself. I think, for example, that Congress and our General Assembly could not seat an alien and that the courts could oust him.

DEEN, Judge, dissenting. I differ with the majority opinion for two reasons:

■ The appeal in this case is from the overruling of a general demurrer to a petition seeking to contest the result of a political election. Under the Election Code (Ga. L. 1964, Ex. Sess. p. 26, *Code Ann.* § 34-1709) it is provided only: "An appeal from the final determination of the court may be taken within 10 days from the rendition thereof to the Supreme Court or Court of Appeals as in other civil cases." The word "other" of course refers to the creation of the new statutory right of appeal to an appellate judicial tribunal, not to the time of appeal, since no other cases, either civil or criminal, were subject to a 10-day appeal cut-off period at the time the Act was passed, and no right of appeal from an election contest decided by a superior court judge or in any other manner existed prior to 1964 when the Election Code was passed, the decision of an election contest being a political and not a judicial proceeding. *Johnson v. Jackson,* 99 Ga. 389 (27 SE 734); *Nichols v. Faircloth,* 95 Ga. App. 641 (98 SE2d 416) and citations. The *Johnson* case held an Act allowing the judge of the superior court to decide such contests was not violative of the separation of powers provisions of the Constitution because "the person to whom these duties were assigned was not required to deal with the subject *in his capacity as judge* of the superior court." (Emphasis supplied.) When statutory provision is made for contesting an election it "is not an action at law or a suit in equity. It is a special statutory proceeding, conferring power which must be exercised within the limits and by the method prescribed by the statute." *Harris v. Sheffield,* 128 Ga. 299, 303 (57 SE 305). Thus, the only right of review given by statute (and none other exists) is the right to appeal *within 10 days* and *after final determination.*

The Appellate Practice Act (Ga. L. 1965, p. 18 et seq.) does not purport to create any new rights of appeal in non-judicial controversies where appeals were not previously allowed. A

political contest may by statute receive a judicial review by statutory enactment, but it was not within the purview of the Appellate Practice Act to enlarge the scope of review of political decisions, that Act revising as it did the procedure necessary for, and not the right to, judicial review. Accordingly, the language in *Undercofler v. Grantham Transfer Co.*, 222 Ga. 654, supra, as follows: "The legislature in excepting the three classes of cases (mandamus, quo warranto and writ of prohibition) from the operation of Section 1(a)(2) of the 1965 Appellate Practice Act intended it to apply in all other cases" necessarily refers to cases in which a right of review of the case itself existed prior to the Act. As to these political questions it existed prior to the Act only after final determination of all the issues, and then only within a 10-day period. To hold otherwise would be to say that present *Code Ann.* § 6-701 repeals by implication *Code Ann.* § 34-1709 and such a holding would result in the impossibility of an appeal whatsoever from a decision in an election contest since *Code Ann.* § 34-1709 is the only authorization for an appeal to be had in a political contest. It follows that nothing in *Undercofler* conflicts with what is here held. The judgment overruling a general demurrer in this case is not reviewable, and the appeal being premature, appellees' motion to dismiss should be granted.

■ ■ The majority in determining the question of jurisdiction indirectly concludes that the election contest procedure authorized by the Georgia Election Code of 1964, § 34-1701 et seq., is consistent with and does not conflict with Article I, Sec. V, of the Constitution of the United States. The Georgia Court of Appeals does not have authority or jurisdiction on any question or in any case in which the constitutionality of any law of the State of Georgia is drawn in question. *Code Ann.* § 2-3704 (Par. IV, Sec. II, Art. VI; Constitution of the State of Georgia of 1945.) The two cases cited, Wickersham v. State Election Board (Okla.) 357 P2d 421, and Odegard v. Olson, 264 Minn. 439 (119 NW2d 717) are opinions written by the *Supreme Courts* of Oklahoma and Minnesota. Further, the question of lack of jurisdiction, or the issue of the constitutionality of the contest procedure of the Georgia Election

Code, supra, has not been raised in the trial court. I concur that the trial court did have jurisdiction of the subject matter, but not for the reasons advanced.

The crux of this entire case depends upon the answer to the following question: with regard to the requirements applicable to voting machines and vote-recorders (votomatics) found in Subparagraph (b) of *Code Ann.* §§ 34-1206 and 34-1220 respectively which states: "(b) It *shall permit each elector*, at other than primaries, to vote a straight party or body ticket in one operation, and, in one operation, to vote for all the candidates of one party or body for presidential electors, and, *in one operation, to vote for all the candidates of one party or body for every office to be voted for, except those offices as to which he votes for individual candidates*" (emphasis supplied), where an elector pursuant to the above Subparagraph (b) votes a straight ticket for all the candidates of one party or political body and in the same operation votes for individual candidates of another party with respect to one or more offices do the votes cast, regarding the offices as to which the elector votes for individual candidates constitute (a) a "split-ticket vote" which should be counted only for the individual candidate specifically voted for, or (b) a vote for both candidates for the particular office which would result in an "over-vote," the counting of which is specifically precluded by *Code Ann.* § 34-1220 (e) as amended, (Ga. L. 1965, p. 226.)?

It is my view that the statute is crystal clear in providing that an elector voting under vote-recorder and voting machine requirements may split his vote by punching the straight ticket of one party, and then punch opposite the name of one or more candidates of the opposing party as to the offices for which he wanted to vote for opposing candidates, there is no provision contained in *Code Ann.* § 34-1220(e), as amended, supra, which prohibits split voting between parties. This last cited section precludes only "the counting of votes for any candidate, or upon any question, for whom or upon which an elector is not entitled to vote [limits elector to appropriate questions and candidates] and shall preclude the counting of votes for more persons for any office than he is entitled to vote for [prohibits

the counting of votes when elector votes for two candidates for the same office] and shall preclude the counting of votes for any candidate for the same office or upon any question more than once [limits counting of vote]." Georgia's provision Subparagraph (b) of *Code Ann.* §§ 34-1206 and 34-1220 permitting split-ticket votes is supported by the following foreign cases: Pires v. Bracken, 412 Ill. 416, 419 (107 NE2d 706) (in which the court said that) *"The specific marking controls the general, and the ballot cannot be counted for the candidate of the party whose circle is marked, but, as to that office, only for the opposing candidate whose name is marked by a cross in the square"* (emphasis supplied); Opening of Ballot Box in Third Election Dist. of Forty-First Ward, 328 Pa. 535 (195 A 890); State ex rel. Hammond v. Hatfield, 137 W. Va. 407 (71 SE2d 807); State ex rel. Bumgardner v. Mills, 132 W. Va. 580 (53 SE2d 416); State ex rel. Robeson v. Clark, 28 Wash. 2d 276 (182 P2d 68); Denny v. Pratt, 105 Conn. 256 (135 A 40).

It is true that these latter six foreign cases cited provide for split-ticket voting by paper ballot. *With regard to the voto-matic area, Georgia has apparently adopted the Pennsylvania rule clearly providing for split-ticket voting. The Georgia General Assembly has not yet adopted the Pennsylvania rule as to split-ticket voting when voting by paper ballots.* I heartily concur with Judge Eberhardt's expression that "it is in the interest of both the candidate and the voter to have a rule of uniformity so that voters moving from a paper ballot area into a votomatic area, or vice versa, or a voter from a votomatic area who casts an absentee ballot, will not be confronted with the confusing and illogical change." *However, where the legislature has spelled out a separate rule applicable to casting of ballots by vote recorder or votomatic as opposed to casting votes by paper ballot, then the question of providing a rule of uniformity addresses itself to the Georgia legislature and not to this court.*

The majority opinion outlines in detail the instructions found in § 34-1314 (c) and related Code sections. It is conceded that such instructions are specifically applicable only to the paper

ballot voting procedure. Certainly the many provisions "make a mark . . . make a check mark . . . any erasure . . . *any ballot marked by anything but pen or pencil shall be void and not counted*" would have no bearing on this case. In fact if this section did apply to votomatic balloting, the latter provision (with emphasis added) would in effect repeal and nullify the use of voting machines and vote-recorders in this state.

Great emphasis is placed on the publicity in the newspapers, over the radio and television as to the manner in which an elector may vote a split ticket. Assuming arguendo that the publicized instructions are applicable to split-ticket paper ballot voting, assuming further that almost fifty percent of the total state electors are in urban areas that use voting machines, vote-recorders (votomatics), and assuming that one of our parties consistently has over 100 candidates running for as many offices, and that another growing political party in this state will have 50 to 100 candidates in a few years opposing the first party candidates, the majority opinion is saying to the urban area electors using voting machines and vote-recorders, that if you desire to vote for all candidates of your party except one, you should not and cannot put a cross in the circle or indicated space at the head of a party ticket, or punch the space on the votomatic ticket, but should proceed to split the ticket by marking proper marks or punches in indicated spaces opposite the name of *every candidate* for whom you wished to vote or for whom you wished to write in a vote. This would create a chasm of chaos, confusion and long voting lines of waiting and delay would exist if all split-ticket urban voting were performed in this manner. An elector has the right to vote in this manner, and he further has the right to cast a speedy ballot by voting one time for all party candidates while simultaneously in one operation casting individual votes for candidates of a particular office.

For this court to classify and hold that a "split-vote" is an "over-vote" and therefore could not be counted, in the light of Subparagraph (b), supra, would constitute, in my opinion, judicial usurpation of a legislative prerogative.

A cardinal rule for the construction of statutes is that no part is to be so construed as to render it meaningless. *Scott v. Mayor &. of Mount Airy,* 186 Ga. 652 (198 SE 693); *Humthlett v. Reeves,* 211 Ga. 210 (85 SE2d 25). *Code Ann.* §§ 34-1206 and 34-1220 contain three provisions, specifying that each elector at general elections shall have provision for voting in one operation for: (a) a straight party ticket; (b) all candidates of one party for presidential electors, and (c) all candidates of one party *except those offices as to which he votes for individual candidates.*

If the italicized clause is deleted from (c) supra, or is declared meaningless, then (c) has exactly the same meaning as (a). Either this language must be presumed to have no meaning, or it means that it is permissible for the voter in one operation to vote for all candidates of one party, and then, by voting individually, to split his ticket without the ballot being counted as an over-vote. Thus, where the voter "in one operation" votes for a long list of candidates of a single party, and then, as to some of these "he votes for individual candidates," the legislature has in effect given a statutory intent to the voter to have the individual candidate take precedence over the party candidate on his ballot.

The trial court did not err in overruling the general demurrer to the petition as to the issue discussed above and as to the issues outlined in Division 2 (c) of the majority opinion. Judgment of the lower court should be affirmed.

I am authorized to state that Chief Judge Felton concurs in Divisions 1 and 2 (b) of this dissent.