Natalie MEYER, Secretary of State
for the State of Colorado, Petitioner/Cross–Respondent,

and

Charlotte Houston, Clerk and Recorder
for Boulder County, and Drew
Clark, Cross–Respondents,

v.

Peggy LAMM, Harold M. Anderson, and
Raymond Leidig, Respondents/Cross–
Petitioners.

No. 92SA472.

Supreme Court of Colorado,
En Banc.

Feb. 22, 1993.

Gale A. Norton, Atty. Gen., Raymond T. Slaughter, Chief Deputy Atty. Gen., Timothy M. Tymkovich, Sol. Gen., Alesia M. McCloud–Chan, Asst. Atty. Gen., Denver, for petitioner/cross-respondent.

Buchanan, Gray, Purvis & Schuetze, Frank N. Dubofsky, Boulder, for respondents/cross-petitioners.

Chief Justice ROVIRA delivered the Opinion of the Court.

We have agreed to review the final order and judgment of the Boulder County District Court entered in a controversy arising from the 1992 election for the office of state representative from House District 13. *See* § 1–1–112(2), 1B C.R.S. (1980). Initially, we conclude that the district court had subject matter jurisdiction over the

controversy and that the issues presented in the controversy were justiciable. On the merits, we affirm the judgment of the district court in part, and reverse in part.

## I

Drew Clark[1] was the Republican Party candidate for state representative from House District 13, and his name was the only name listed on the ballot for that office. Peggy Lamm opposed Clark as a write-in candidate, and was the only person who had filed an affidavit of intent pursuant to section 1–4–1001, 1B C.R.S. (1991 Supp.). She was therefore the only person for whom write-in votes could be counted for the office of state representative from House District 13. *Id.* The initial canvass of the votes cast in the election revealed that Clark received slightly over 100 votes more than Lamm. Because the difference was less than one percent of the votes cast for Clark, the Colorado Secretary of State, Natalie Meyer, ordered a mandatory recount of the votes. *See* § 1–11–101, 1B

C.R.S. (1980).[2] On November 16, 1992, the Boulder County Clerk and Recorder, Charlotte Houston, sent a letter to the candidates informing them that, pursuant to instructions she had received from the secretary of state, she would direct the recount judges not to count certain ballots that had initially been counted for Lamm. The instructions directed that ballots which contained the surname "Lamm" only, or which contained an incorrect first name or initial, would not be counted for Lamm.

On November 17, 1992, three days before the recount was to be conducted, the plaintiffs[3] filed a complaint for injunctive and declaratory relief in the Boulder County District Court, naming the secretary of state, the Boulder County Clerk and Recorder, and Clark as defendants. The complaint alleged that "there are numerous ballots with just the surname and with incorrect initials or first names which, if properly counted, could change the result of this election." The plaintiffs asserted that sections 1–7–309(3), 1B C.R.S. (1991

---

1. The petitioner in this court is the Colorado Secretary of State, Natalie Meyer. The Secretary of State; the Boulder County Clerk and Recorder, Charlotte Houston; and Drew Clark were the defendants in the district court, and will be referred to in this opinion individually by name or title, or collectively as the "defendants." The cross-petitioners, who are also the respondents here, are Peggy Lamm, Harold M. Anderson, and Raymond Leidig. They were the plaintiffs in the district court and will be referred to as the "plaintiffs" or individually by name.

2. Section 1–11–101, 1B C.R.S. (1980), provides, in relevant part:

    **Recounts for congressional, state, and district offices—expenses of recount.** (1) If, on the twentieth day after the close of the general ... election ... or sooner if all the official abstracts of votes have been received in the office of the secretary of state, it appears, as evidenced by the official abstracts of votes, that any candidate for United States senator, representative in congress, or any state or district office ... failed to be elected in a general ... election by one percent or less of the highest vote cast for a candidate for that office, the secretary of state shall order a complete recount of the votes cast for said office.

    (2) The secretary of state shall make demand upon the county clerk and recorder of each county involved by registered mail for a public recount to be conducted in the county at a place prescribed by the secretary of state. The recount shall be completed by no later than the thirtieth day after the general ... election.... The secretary of state shall also promulgate and provide each such county clerk and recorder with such rules and regulations as are necessary to conduct such recount in a fair, impartial, and uniform manner, including provisions for allowing interested political parties and candidates involved to be represented by watchers during the recount.

3. The original verified complaint recited that Lamm was "a resident and eligible voter in Colorado State House District Number 13. She is also a candidate for that position. On November 3, 1992, she voted for herself to be the State Representative."

    In addition, "Plaintiff Raymond Leidig has been a resident and eligible voter for Colorado State House District Number 13. He voted for Peggy Lamm for House District 13." Finally, "Harold M. Anderson has been a resident and eligible voter for Colorado State House District Number 13. He cast a vote for 'Mrs. Lamm' and either has been or will be disenfranchised if his vote is not counted on November 20, 1992 at the mandatory recount."

Supp.),[4] and 1–7–507(1)(e), 1B C.R.S. (1991 Supp.),[5] upon which the secretary of state's instructions were purportedly based, must be construed in a manner that gives effect to the voter's intent. The complaint also claimed that, if the above statutes were interpreted as the secretary of state interpreted them, the statutes would deprive a voter of his rights under the state and federal constitutions to cast a vote and have the vote counted. The plaintiffs prayed for declaratory relief that the statutes be construed liberally, or in the alternative declared unconstitutional, and asked for a restraining order and other injunctive relief against the secretary of state and the county clerk and recorder to effectuate the court's ruling if necessary.

The district court declined to restrain the recount that was to take place on November 20, 1992. On November 23, the county clerk and recorder sent a letter to the district court which catalogued the results of the recount in the following manner:

> The results contained herein have been determined through a manual sort and machine count of all ballots from all House District 13 precincts. This recount has been performed in accordance with the rules provided by the Secretary of State and the order of the District Court in *Lamm v. Houston* Civil Action No. 92 CV 1532, Boulder District Court.

| | |
|---|---:|
| Total count of votes for Drew Clark | 13,139 |
| Total count of write-in votes for Peggy Lamm with Secretary of State regulations | 12,759 |
| Number of Name discrepancies | |
| other variations on Peggy Lamm | 234 |
| Surname "Lamm" only | 301 |
| Number of Overvotes | 26 |
| Write-in wrong place | 55 |
| Clark vote plus invalid write-in | 3 |

4. Section 1–7–309(3), 1B C.R.S. (1991 Supp.), which applied to paper ballots and was in effect at the time of the 1992 general election, provides:

> (3) No cross mark (X) shall be required to the right of the name of any candidate written in by a voter. *Each write-in vote shall include a reasonably correct spelling of the last name and the given name or the initial or the nickname and the last name of the candidate for whom the vote is intended.*

(Emphasis added.) Section 1–7–309 was repealed and reenacted in 1992, and, effective January 1, 1993, § 1–7–309(5), 1B C.R.S. (1992 Supp.) states:

> (5) When the election judges in any precinct discover in the counting of votes that the name of any candidate voted for is misspelled or the initial letters of the given name are transposed or omitted in part or altogether, the vote for that candidate shall be counted if the intention of the voter to cast a vote for that candidate is apparent.

5. Section 1–7–507(1)(e), 1B C.R.S. (1991 Supp.), which applied to electronic vote counting and was in effect at the time of the 1992 general election, provides:

> (e) No ballot without the official endorsement, except as provided in section 1–6–408, shall be allowed to be deposited in the ballot box, and no ballot shall be counted unless it is provided in accordance with the provisions of this code. *Each write-in vote shall include a reasonably correct spelling of a given name or an initial or nickname and the last name of the person for whom the vote is intended.* Ballots not counted shall be marked "defective" on the back thereof and shall be preserved by the county clerk and recorder pursuant to section 1–7–701.

(Emphasis added.) Section 1–7–507, 1B C.R.S. (1991 Supp.), was repealed in 1992, and, effective January 1, 1993, § 1–7–508, 1B C.R.S. (1992 Supp.) states:

> (2) Votes cast for an office to be filled ... shall not be counted ... if for any reason it is impossible to determine the elector's choice of candidate....
>
> ....
>
> (4) Ballots not counted because of the election judges' inability to determine the elector's intent for all candidates and ballot issues shall be marked "defective" on the back, banded together, separated from the other ballots, and preserved by the designated election official pursuant to section 1–7–801.

The next three categories requested by the Clark Campaign on November 20

| | |
|---|---:|
| Punches in line under Clark name (no write-in) | 531 |
| Punches in line over Clark name (no write-in) | 22 |
| Punches in lines under and over Clark name (no write-in) | 5 |

---

The county clerk and recorder also stated that "no certification of the 'final results' from the recount has been made, due to the pendency of this civil action. My certification of the final results will await further action of the court in this matter." After the recount, under the secretary of state's instructions, Lamm would still trail Clark by 380 votes, but would receive more votes than Clark if all of the ballots containing discrepancies with respect to the name "Lamm" were counted for her.

The secretary of state moved to dismiss the complaint on the grounds that the district court lacked subject matter jurisdiction over the controversy because article V, section 10 of the Colorado Constitution granted the General Assembly the exclusive authority to determine election contests involving its own members, and because no statute gave district courts the jurisdiction to hear election contests involving members of the General Assembly. On November 30, 1992, the plaintiffs filed an amended complaint and verified petition for injunctive and declaratory relief, alleging that the district court had subject matter jurisdiction to hear the matter under, *inter alia*, sections 1-1-111 and -112, 1B C.R.S. (1980),[6] and 42 U.S.C. § 1983.

The district court held an evidentiary hearing on December 1, 1992, and issued the following orders from the bench. First, the court concluded that it could exercise subject matter jurisdiction over the controversy under section 1-1-112, as well as under the court's inherent power to decide statutory and constitutional issues, notwithstanding article V, section 10. Next, the court held that all ballots with the surname "Lamm" only, or in conjunction with "Miss," "Mrs.," or "Ms.," must be counted for Peggy Lamm. Moreover, the district court allowed to be counted for

---

6. These sections provide, in pertinent part:

**1-1-111. Neglect of duty and wrongful acts.** (1) When it appears, by verified petition of any elector, to any district court that any neglect of duty or wrongful act by any person charged with a duty under this code has occurred or is about to occur, the court shall issue an order requiring the person charged to forthwith perform the duty or desist from the wrongful act or to forthwith show cause why the order should not be obeyed. The burden of proof in such charge shall be upon the complainant.

....

(3) Such proceedings may be reviewed and finally adjudicated by the supreme court of the state, if application to such court is made within three days after the termination thereof by the court in which the petition was filed and if the supreme court is willing to assume jurisdiction of the case.

§ 1-1-111, 1B C.R.S. (1980).

**1-1-112. Controversies.** (1) When any controversy arises between any official charged with any duty or function under this code and any candidate, the officers or representatives of any political party, persons who have made nominations, or any other person, the district court, upon the filing of a verified petition by any such official or person setting forth in concise form the nature of the controversy and the relief sought, shall issue an order commanding the respondent in such petition to appear before the court and answer under oath to such petition. The court shall summarily hear and dispose of any such issues with a view to obtaining substantial compliance with the provisions of this code by the parties to such controversy, shall make such orders and judgments, and shall issue the writ or process of such court to enforce all such orders and judgments.

(2) Such proceedings may be reviewed and finally adjudicated by the supreme court of the state, if application to such court is made within three days after the termination thereof by the court in which the petition was filed and if the supreme court is willing to assume jurisdiction of the case.

§ 1-1-112, 1B C.R.S. (1980).

Peggy Lamm certain ballots on which the correct name was written in close proximity to the area provided on the ballot for House District 13. However, the district court found that write-in votes with the surname "Lamm" but containing an incorrect first initial or first name or nickname could not be counted for Peggy Lamm. The district court also made rulings with respect to the counting of overvotes, and votes where the name was not written in the proper place. Under the district court's rulings, Peggy Lamm would still be credited with fewer votes than Drew Clark, but the margin would be narrower than if the votes were counted under the instructions issued by the secretary of state.

Following the district court's bench ruling, which was incorporated in a written final order and judgment dated December 4, 1992, the defendants petitioned for review of the district court's action, raising two issues:

1. Whether the district court erred in determining that it had subject-matter jurisdiction to determine an election contest between candidates for a state legislative seat.

2. Whether the district court incorrectly construed sections 1–7–309(3) and 1–7–507(1)(e), 1B C.R.S. (1980 & 1991 Supp.), as requiring the count of write-in ballots which did not include a first name (or initial) and a last name.

The plaintiffs cross-petitioned for review of the district court judgment, and their petition fairly raised the following issues:

1. Whether the district court erred as a matter of law in holding that ballots would not be credited to candidate Peggy Lamm unless a correct first name or initial was written in addition to the name "Lamm."

2. Whether the district court erred in applying an improper legal standard in ascertaining the voter's intent.

3. Whether the district court erred in instructing the clerk to count votes for candidate Clark where the hole was punched and an invalid name was written in.

4. Whether the district court erred in concluding that ballots reflecting a write-in vote for Peggy Lamm, as well as a vote for Drew Clark that had been scratched out, should not be counted for either candidate.

5. Whether the district court erred in holding that some write-in votes for candidate Peggy Lamm should not be counted because of their placement on the ballot.

By order dated December 11, 1992, we agreed to review the controversy. Subsequent to the final order and judgment, the district court entered a stay preventing the county clerk and recorder from certifying and transmitting the results of the recount to the secretary of state "until further order of the Supreme Court."[7]

## II

## Jurisdiction of the District Court

There are really two questions to be answered in this threshold issue. The first is whether the district court had subject matter jurisdiction over the election controversy. If the first question is answered in the affirmative, we then must determine whether the controversy is "justiciable" or whether a decision on the merits by the district court would violate the separation of powers doctrine. *See Powell v. McCormack,* 395 U.S. 486, 512, 89 S.Ct. 1944, 1959, 23 L.Ed.2d 491 (1969).

[7]. After we agreed to review the order and judgment, the secretary of state filed a motion for partial dismissal of the appeal. The secretary of state alleged that on January 13, 1993, the House of Representatives seated Drew Clark as the representative for District 13. The secretary of state contends that all issues (with the exception of the subject matter jurisdiction issue) are now moot and that, since the statutory provisions pertaining to write-in votes have been amended, the court should dismiss the appeal except for the question of subject matter jurisdiction. The respondents filed a response in which they allege, *inter alia,* that the seating of Drew Clark was illegal and that the case is not moot and should not be dismissed. After consideration we denied the motion. Questions pertaining to the legality of the seating of Drew Clark are beyond the scope of our review of this controversy, even assuming such questions to be justiciable.

## A. *Subject Matter Jurisdiction*

▮ The subject matter jurisdiction conferred on the district courts of this state is set forth in section 9 of article VI of the Colorado Constitution:

> **District courts—jurisdiction.** (1) The district courts shall be trial courts of record with general jurisdiction, and shall have original jurisdiction in all civil, probate, and criminal cases, except as otherwise provided herein, and shall have such appellate jurisdiction as may be prescribed by law.

Colo. Const. art. VI, § 9. The judicial power thus granted is very broad:

> These provisions of the Colorado Constitution confer unrestricted and sweeping jurisdictional powers in the absence of limiting legislation. The absence of a statute or constitutional provision which specifically designates a forum or spells out standards for decision will not preclude exercise of a court's jurisdiction, even where the subject matter would not have been subject to judicial authority at common law. While jurisdiction may be limited by the legislature, no statute will be held to so limit court power unless the limitation is explicit.

*In re A.W.*, 637 P.2d 366, 373–74 (Colo. 1981) (citations and footnote omitted). The fact that judicial resolution of election controversies was unknown at common law is therefore not dispositive.[8]   *Cf. Young v. Mikva*, 66 Ill.2d 579, 6 Ill.Dec. 904, 905, 363 N.E.2d 851, 852 (1977) (because the right to contest an election was not recognized at common law, courts have no jurisdiction over such matters unless provided by statute).

Article V, section 10, of the Colorado Constitution provides that "[e]ach house [of the general assembly] shall choose its other officers and shall judge the election and qualification of its members."[9]   We have said with respect to this provision that "[t]he power thus vested and conferred is exclusive. The courts cannot interfere with its exercise, or review the decision of either house, acting under and in pursuance of said power. Such decision is conclusive." *Hughes v. Felton*, 11 Colo. 489, 490, 19 P. 444, 444–45 (1888). *See also People ex rel. Barton v. Londoner*, 13 Colo. 303, 307, 22 P. 764, 766 (1889) (stating in dicta that the jurisdiction of state legislative bodies in election contests affecting their own members has universally been held to be exclusive).

We believe that this constitutional provision is not an explicit limitation on the jurisdiction conferred on the district courts by article VI, section 9, with respect to the instant controversy. *See Powell*, 395 U.S. at 514, 89 S.Ct. at 1960. Our conclusion that article V, section 10, does not by itself

---

**8.** Article VII, section 12, of the Colorado Constitution is not to the contrary. That provision states:

> **Election contests—by whom tried.** The general assembly shall, by general law, designate the courts and judges by whom the several classes of election contests, *not herein provided for*, shall be tried, and regulate the manner of trial, and all matters incident thereto, but no such law shall apply to any contest arising out of an election held before its passage.

Colo. Const. art. VII, § 12 (emphasis added). In *Booth v. County Court*, 18 Colo. 561, 33 P. 581 (1893), we interpreted this constitutional provision with respect to an election contest between rival claimants to the office of mayor of a city of the second class. We stated that "[t]he jurisdiction to try election contests, therefore, must be conferred by statute; and unless by some legislative enactment the county court has been designated as the tribunal for the trial of a contest of this character, the interposition of this court is properly invoked to restrain it from entertaining jurisdiction of the contest in question." *Id.* at 563, 33 P. at 581.

If, however, the present election controversy constitutes an "election contest" in the constitutional sense, as the secretary of state maintains, it is "herein provided for" in article V, § 10. *Town of Pagosa Springs v. People*, 23 Colo.App. 479, 505–06, 130 P. 618, 628 (1913). We conclude, therefore, that article VII, § 12, does not, by itself, bar the district court from exercising subject matter jurisdiction over the present controversy.

**9.** This constitutional provision, which has remained essentially unchanged since its inclusion in the Colorado Constitution of 1876, was apparently derived from U.S. Const. art. I, § 5, cl. 1, which provides in pertinent part that "Each House shall be the Judge of the Elections, Returns and Qualifications of its own Members...." No one has suggested that the slight difference in the texts of the two provisions is significant.

divest district courts of subject matter jurisdiction in this case is buttressed by certain statutory provisions.

First, section 2-2-303, 1B C.R.S. (1980), provides:

> **Committee on credentials—permanent organization.** When the houses [of the general assembly] are temporarily organized, the presiding officer in each house, with the consent of said house, shall appoint a committee of three members thereof to report upon the credentials of those claiming to be elected members of their respective houses. When the report is made, those reported as elected shall proceed to the permanent organization of their respective houses. *Each house will be the sole judge of the election returns and qualifications of its own members.*

(Emphasis added.) The last sentence of this statutory provision, similar to article V, section 10, implies that each house will judge the election returns of its own members after a report from the committee on credentials, and after "those claiming to be elected members of their respective houses" present their credentials. Since the secretary of state has not yet transmitted a certificate of election to either of the two candidates in House District 13, *see* § 1-10-202, 1B C.R.S. (1980), there is as yet no person with such prima facie credentials to present to the committee on credentials.

Moreover, the statutes governing the procedures for "election contests" for state senator or representative are contained in sections 1-11-201, and -206 to -208, 1B C.R.S. (1980 & 1991 Supp.). Section 1-11-206(1) states:

> **Contests for state senator or representative.** (1) The election of any person *declared duly elected as a state senator or a member of the state house of representatives* may be contested by any registered elector of the district to be represented by such senator or representative. Each house of the general assembly shall hear and determine election contests of its own members.

§ 1-11-206(1), 1B C.R.S. (1991 Supp.) (emphasis added). When the district court heard this controversy, no person had yet been "declared duly elected as ... a member of the state house of representatives" in House District 13. The statutes pertaining to "election contests" are contained in part 2 of article 11, title 1, of the Revised Statutes. The mandatory recount in this case was conducted pursuant to section 1-11-101, 1B C.R.S. (1980). This statute is included in part 1 of article 11, title 1, and thus precedes, and is separate from, the statutes governing "election contests."

It is reasonable to conclude, therefore, that proceedings involving recounts of election results which are inherently tentative and are not final or conclusive, and in which recounts are conducted pursuant to the election laws prior to the certification by the secretary of state that a person has been duly elected, are not "election contests" for the purposes of either part 2, article 11, title 1 of the Revised Statutes, or article V, section 10, of the state constitution. Because the election is not final and the results are not complete pending the recount authorized by statute, a district court may exercise subject matter jurisdiction over such recount proceedings in order to ensure that they are conducted in accordance with constitutional and statutory provisions. A number of courts in other states have reached similar conclusions. *See State ex rel. Wahl v. Richards,* 44 Del. 566, 64 A.2d 400, 403 (1949) (supreme court had jurisdiction to issue mandamus compelling superior court to recanvass votes cast for office of representative in general assembly notwithstanding constitutional power given each house of legislature to determine election and qualifications of its own members; relator only sought order requiring board of canvass to properly perform duty imposed by law in order that relator could procure prima facie evidence that he had been duly elected to the office of state representative); *Blackburn v. Hall,* 115 Ga.App. 235, 154 S.E.2d 392, 397 (1967) (where as part of election proceedings, a recount is provided in proper instances, the election process is not over until recount is complete; for purpose of affording recount and of obtaining compliance with the election laws in the counting

and tabulation of ballots, the courts of the state have jurisdiction to entertain special statutory proceeding, even in election for Representative to United States House of Representatives, notwithstanding U.S. Const. art. I, § 5); *State ex rel. Wheeler v. Shelby Circuit Court*, 267 Ind. 265, 369 N.E.2d 933, 935 (1977) (a recount being merely an extension of the voting process in an effort to ensure the correctness of the vote count, circuit court had subject matter jurisdiction to order recount in elections involving state legislative offices); *Rice v. Power*, 19 N.Y.2d 106, 278 N.Y.S.2d 361, 361–62, 224 N.E.2d 865, 865–66 (1967) (election law vested jurisdiction in trial court to order recanvass of absentee and military ballots cast in election for office of delegate to Constitutional Convention, notwithstanding constitutional provision making the Convention the ultimate "judge of the election, returns and qualifications of its members"; even though Convention was privileged to disregard certificate issued by Board of Elections in determining whether a delegate was properly elected and seated, this does not vitiate power of the courts to require that the certificate accurately reflect the tally of the votes cast); *State ex rel. Olson v. Bakken*, 329 N.W.2d 575, 577–79 (N.D.1983) (although legislature would be the final judge on the election of one of its members, state constitutional provision that each house of the legislature shall be the judge of the election returns and qualifications of its members did not bar court from entertaining election contest involving recount of votes cast in the election); *Wickersham v. State Election Bd.*, 357 P.2d 421, 424–25 (Okla.1960) (if right to recount votes cast in election to Congress is provided for by statute in proper instances, an election cannot be considered as over or final until recount is allowed; until election is final, the courts can and should exercise jurisdiction for purpose of requiring lower tribunals to comply with election statutes); *City*

*of Barre v. Kidder*, 121 Vt. 266, 155 A.2d 742, 744 (1959) ("A recount [of the ballots cast in an election] is not a contest. It is an ascertainment of the result shown by the ballots.").

Our conclusion that article V, section 10 does not prohibit the district court from exercising subject matter jurisdiction over a recount proceeding also receives support from the Supreme Court decision in *Roudebush v. Hartke*, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972). In *Roudebush v. Hartke*, the Court held that article I, section 5, clause 1, of the United States Constitution, which provides that each house of congress shall be the judge of the elections, returns and qualifications of its own members, did not prohibit Indiana from conducting a recount of the 1970 election ballots for United States Senator, where the recount of votes was an integral part of the Indiana electoral process and was within the ambit of the federal constitutional provision delegating to the states the regulation of the times, places and manner of holding congressional elections, U.S. Const. art. I, § 4.[10]

■ Further, there is nothing within the text of section 1–1–112 which would limit the statute's application to pre-election controversies only, as the secretary of state urges. The statute refers to "any controversy aris[ing] between any official charged with any duty or function *under this code* and any candidate...." (Emphasis added.) We conclude that article V, section 10, is not an explicit limitation upon the subject matter jurisdiction of the district court to hear the instant election controversy, and that the district court, as a court of general jurisdiction, possessed the subject matter jurisdiction to hear and decide the case below.

## B. *Justiciability*

■ The second, and more difficult question, is whether the district court should

---

**10.** In *Rogers v. Barnes*, 172 Colo. 550, 474 P.2d 610 (1970), we held that a state statute purporting to vest jurisdiction in this court to try an election contest arising out of a primary election for nomination to the Congress of the United States was in conflict with U.S. Const. art. I,

§ 5, cl. 1, and that the federal constitutional provision prevailed. *Rogers* was decided before and without benefit of *Roudebush v. Hartke*, 405 U.S. 15, 92 S.Ct. 804, 31 L.Ed.2d 1 (1972), and we believe that the holding in *Rogers* should not be extended.

nevertheless have declined to exercise subject matter jurisdiction over this election controversy because it was nonjusticiable. In deciding whether a case or controversy is justiciable, two determinations must be made. We must first ascertain "whether the claim presented and the relief sought are of the type which admit of judicial resolution." *Powell*, 395 U.S. at 516–17, 89 S.Ct. at 1961–62. Second, we must determine whether the controversy presents a nonjusticiable "political question"; *i.e.*, a question "the resolution of which should be eschewed by the courts," *Colorado General Assembly v. Lamm*, 704 P.2d 1371, 1378 (Colo.1985), because of the separation of powers doctrine inherent in the Colorado Constitution, *Colorado Common Cause v. Bledsoe*, 810 P.2d 201, 205 (Colo.1991). *See Powell*, 395 U.S. at 517, 89 S.Ct. at 1961.

In evaluating the first question, our "inquiry necessarily proceeds to the point of deciding whether the duty asserted can be judicially identified and its breach judicially determined, and whether protection for the right asserted can be judicially molded." *Baker v. Carr*, 369 U.S. 186, 198, 82 S.Ct. 691, 699, 7 L.Ed.2d 663 (1962) (quoted in *Powell*, 395 U.S. at 517, 89 S.Ct. at 1961). The plaintiffs' complaint and amended complaint alleged that the secretary of state and the county clerk and recorder were acting, or preparing to act, in derogation of their duties as prescribed under the election laws and the state and federal constitutions, and that the defendants' course of action interfered or would interfere with the plaintiffs' fundamental right to vote. The plaintiffs asked the district court to construe two statutes contained in the Election Code pertaining to the counting of write-in votes, or in the alternative, to strike down the statutes if they could not be construed in a constitutional manner. Finally, the plaintiffs asked the district court to order the secretary of state and county clerk and recorder to perform their duties under the Election Code in conformity with the district court's rulings, if necessary.

■ "[T]he right to vote is a fundamental right of the first order." *Erickson*

*v. Blair*, 670 P.2d 749, 754 (Colo.1983). It is guaranteed by the federal constitution, and by article II, section 5 of the Colorado Constitution. Concomitant with the right to cast a vote is the right to have that vote counted without undue interference with the exercise of that right. *Erickson v. Blair*, 670 P.2d at 754. Since "the duty asserted can be judicially identified and its breach judicially determined," and "protection for the right asserted can be judicially molded," *Baker v. Carr*, 369 U.S. at 198, 82 S.Ct. at 699, we conclude that "the claim presented and the relief sought are of the type which admit of judicial resolution." *Powell*, 395 U.S. at 516–17, 89 S.Ct. at 1961–62. *See also Lamb v. Hammond*, 308 Md. 286, 518 A.2d 1057, 1066 (1987) (court's role in making certain that board of canvassers follow the legislature's statutory directions as to how to collect and count votes for seat in state legislature was separate from legislature's ultimate power to judge the elections and qualifications of its members; and issue presented was fully justiciable).

■ In analyzing whether a case or controversy presents a nonjusticiable political question, we have employed the test formulated in *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710, and which was applied in *Powell*, 395 U.S. at 518–19, 89 S.Ct. at 1962–63. *Colorado Common Cause v. Bledsoe*, 810 P.2d 201, 205 (Colo.1991). The features of a nonjusticiable political question were identified in *Baker v. Carr* as follows:

Prominent on the surface of any case held to involve a political question is found a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision

already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710 (quoted in *Powell*, 395 U.S. at 518–19, 89 S.Ct. at 1962–63, and *Colorado Common Cause*, 810 P.2d at 205).

The district court's role in this case did not intrude on "a textually demonstrable constitutional commitment of the issue to a coordinate political department," *Baker v. Carr*, 369 U.S. at 217, 82 S.Ct. at 710, because, under the interpretation of article V, section 10, above, the court was "not being asked to overturn any legislative determination already made, or to enjoin the [House] from deciding a contest properly presented to it." *Lamb v. Hammond*, 518 A.2d at 1066. Moreover, we find that none of the other *Baker v. Carr* factors of non-justiciability are implicated in this case.

The recount procedures employed in this case do not and will not usurp the House's power to be the final judge of the election under article V, section 10, because they do not

> frustrate[ ] the [House's] ability to make an independent final judgment. A recount does not prevent the [House] from independently evaluating the election any more than the initial count does. The [House] is free to accept or reject the apparent winner in either count, and, if it chooses, to conduct its own recount.

*Roudebush v. Hartke*, 405 U.S. 15, 25–26, 92 S.Ct. 804, 810–11, 31 L.Ed.2d 1 (1972) (footnote omitted).

If the power to count and judge election returns resides solely within the ambit of the legislative branch even at the point of a mandatory recount as the secretary of state asserts, then the secretary of state, who is a member of the executive branch, is necessarily trespassing on this exclusive power by issuing directives and instructions to the county clerk and recorder on which write-in votes to count. The secretary of state's directives are not issued ministerially; the exercise of her duties necessarily involves and requires the interpretation of the same constitutional and statutory provisions as does the role assumed by the district court. Taken to its logical conclusion, therefore, the secretary of state's separation of powers argument would deny the executive department a role in the recount process, and the statutes purporting to grant her such a role would be in derogation of article V, section 10. In our opinion, such an extreme position is unwarranted.

We conclude that the district court had subject matter jurisdiction to hear the instant election controversy and that the controversy was fully justiciable. Our conclusion is not changed by the fact that the House retains the ultimate power to judge the elections and qualifications of its members, *Hughes v. Felton*, 11 Colo. at 490, 19 P. at 444–45, and "is free to accept or reject the apparent winner in either count, and, if it chooses, to conduct its own recount." *Roudebush v. Hartke*, 405 U.S. at 26, 92 S.Ct. at 811.

III

After concluding that it had subject matter jurisdiction to hear the controversy, the district court in a bench ruling on December 1, 1992, set out the principles it found applicable to the disputed write-in votes, and the county clerk and recorder was directed to count the ballots in a manner consistent with the ruling.

The district court found it significant that the voters in this case were not given any official explicit instructions about how to cast write-in votes. In particular, voters were not told that in order to have their vote count, they must comply with sections 1–7–309(3), 1B C.R.S. (1991 Supp.), or 1–7–507(1)(e), 1B C.R.S. (1991 Supp.), or that they must write in the first name or initial and the last name of the person they wished to vote for in order for the ballot to count.

Concluding that a strict and literal application of sections 1–7–309(3) and 1–7–507(1)(e) might present constitutional problems, the district court found that substantial compliance with either of the above statutes would be sufficient. "The Court

believes that the correct standard to be used ... is to determine that the vote is clearly for Peggy Lamm." In cases where the voter wrote in "Lamm" (or a reasonable misspelling thereof such as "Lamb") only, or wrote "Ms. Lamm," "Mrs. Lamm" or "Miss Lamm," the court found the requisite intent to cast a vote for Peggy Lamm and directed that the votes should be so counted.

However, write-in votes containing the surname "Lamm," and a first name other than Peggy (or Margaret), such as "Dottie," "Nancy," "Patti," "Pelly," "Paula," "Pat," or "Pam" were not to be counted for Peggy Lamm. The district court could not "say that when someone writes Nancy Lamm or someone writes Dottie Lamm that they are intending to vote for Peggy Lamm." The court explained that the reason for counting "Lamm" but not "Nancy Lamm" was based on the absence of instructions to the voters with respect to casting write-in votes: Voters were not instructed that they had to write in "Peggy Lamm" in order for the vote to be counted for Lamm. Thus, a voter might reasonably believe that the surname "Lamm" was sufficient for a valid vote for Peggy Lamm. In the same way, however, no voter was told that a write-in vote for "Nancy Lamm" would be counted for Peggy Lamm. For the same reason, ballots containing the surname "Lamm," but an incorrect first initial, i.e., an initial other than "P." or "M.," were not to be counted.

The district court also found that write-in votes for Lamm should be counted if written in the line intended for the write-in vote (which was directly beneath the line containing Drew Clark's name), or the line immediately below that line. If the name Peggy Lamm (or any of the variants recognized by the district court as valid) was written in anywhere else on the ballot, however, the district court instructed the county clerk and recorder not to count the ballot for Peggy Lamm.

The court also held that ballots containing punches in lines under Drew Clark's name, over Drew Clark's name, and over and under Drew Clark's name, and where no name was written in, could not be counted for anyone. Ballots which were punched for Clark, but Clark's name was crossed out, and the name Peggy Lamm written in, were not counted for either person, as the court found that they were invalid "overvotes," i.e., ballots containing more votes than the number of persons that could be elected to a particular office. Ballots in which Clark's name was punched and Peggy Lamm's name was written in, but not punched, were not to be counted for either candidate.

In her petition for review, the secretary of state contends that the district court incorrectly construed sections 1–7–309(3) and 1–7–507(1)(e), 1B C.R.S. (1980 & 1991 Supp.), as requiring the count of write-in ballots which did not include a first name (or initial) and a last name. The cross-petitioners assert that (1) the court applied an improper legal standard in ascertaining the voter's intent; and (2) the court erred as a matter of law in holding that ballots would not be credited to candidate Peggy Lamm unless a correct first name or initial was written in addition to the name "Lamm."

## A

We start with the central proposition that "voting is of the most fundamental significance under our constitutional structure." *Illinois State Bd. of Elections v. Socialist Workers Party*, 440 U.S. 173, 184, 99 S.Ct. 983, 990, 59 L.Ed.2d 230 (1979). "[T]he right to vote is a fundamental right of the first order." *Erickson v. Blair*, 670 P.2d 749, 754 (Colo.1983). On the other hand, the General Assembly has been granted the authority to "pass laws to secure the purity of elections, and guard against abuses of the elective franchise." Colo. Const. art. VII, § 11. We have recognized, however, that while the General Assembly may place "reasonable restrictions" on the right to vote, *Moran v. Carlstrom*, 775 P.2d 1176, 1179 (Colo.1989), those restrictions may not "deny the franchise to the voter or render its exercise so difficult and inconvenient as to amount to a denial of the right to vote." *Id.* at 1180.

In *Erickson v. Blair*, we examined a statute that prescribed requirements for absentee voting for members of the board of directors of a metropolitan district. We rejected the application of a standard of strict compliance, because such application "would unduly infringe upon the suffrage rights of qualified absentee voters." *Id.* at 754. We found that

> the exercise of the voting right [should not] be conditioned upon compliance with a degree of precision that in many cases may be a source of more confusion than enlightenment to interested voters. A rule of strict compliance, especially in the absence of any showing of fraud, undue influence, or intentional wrongdoing, results in the needless disenfranchisement of absent voters for unintended and insubstantial irregularities without any demonstrable benefit.

*Id.* at 754–55.

In *Burdick v. Takushi*, —— U.S. ——, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992), the Court considered a challenge by a registered voter to Hawaii's prohibition on write-in voting. The voter claimed that the prohibition violated the First and Fourteenth Amendments. The Court first recognized that although the right to vote is fundamental, "government must play an active role in structuring elections...." *Burdick*, —— U.S. at ——, 112 S.Ct. at 2063. This led to the formulation of a two-tier test:

> [T]he rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights. Thus, as we have recognized when those rights are subjected to "severe" restrictions, the regulation must be "narrowly drawn to advance a state interest of compelling importance." *Norman v. Reed*, 502 U.S. ——, ——, 112 S.Ct. 698, 705 [116 L.Ed.2d 711] (1992). But when a state election law provision imposes only "reasonable, nondiscriminatory restrictions" upon the First and Fourteenth Amendment rights of voters, *the State's important regulatory interests are generally sufficient to justify* the restric-

tions. *Anderson [v. Celebrezze]*, 460 U.S. [780], at 788, 103 S.Ct. [1564], at 1569–1570 [75 L.Ed.2d 547] [ (1983) ]; see also *id.*, at 788–789, n. 9, 103 S.Ct., at 1569–1570, n. 9. We apply this standard in considering petitioner's challenge to Hawaii's ban on write-in ballots.

*Burdick*, —— U.S. at ——, 112 S.Ct. at 2063–64 (emphasis added). The secretary of state contends that compliance with sections 1–7–309(3) and 1–7–507(1)(e), 1B C.R.S. (1980 & 1991 Supp.), is mandatory and that a voter's intent should not be given effect against a specific statutory provision, citing *Heiskell v. Landrum*, 23 Colo. 65, 68, 46 P. 120, 121 (1896).

We believe, however, that the rule of substantial compliance as applied in our more recent cases of *Moran v. Carlstrom* and *Erickson v. Blair*, as well as in many older cases, more appropriately protects the right to vote against unnecessary and unreasonable governmental restriction than the rule in *Heiskell*. See *Littlejohn v. People ex rel. Desch*, 52 Colo. 217, 223, 121 P. 159, 162 (1912) (while the legislature has the power to prescribe reasonable restrictions under which the right to vote may be exercised, such restrictions must be in the nature of regulations and cannot deny the franchise itself); *see also Devine v. Wonderlich*, 268 N.W.2d 620, 623 (Iowa 1978) ("Statutory regulation of voting and election procedure is permissible so long as the statutes are calculated to facilitate and secure, rather than subvert or impede, the right to vote."). Furthermore, the rule of substantial compliance is firmly grounded in prior decisions of this court.

In *Kellogg v. Hickman*, 12 Colo. 256, 21 P. 325 (1889), a statute provided for the form, size, and color of paper of ballots to be used by voters, and another statutory provision made it unlawful to print for distribution, or to distribute at the polls, ballots not conforming to statutory requirements. The court rejected the contention that certain votes cast on ballots not conforming to the statutory requirements should be rejected in the absence of any showing of fraud. 12 Colo. at 259–60, 21 P. at 326. Although the statutes prohibit-

ed the distribution of nonconforming ballots to voters, and provided that "ballots shall be written" on certain paper, there was no express declaration that votes cast on nonconforming ballots must be rejected. *Id.* at 260–62, 21 P. at 326–27. Thus, "courts are inclined to restrict the exceptions which expressly exclude the ballot, rather than to extend them, and to admit the ballot if the spirit and intention of the law is not violated, *although a literal construction would vitiate it." Id.* at 263, 21 P. at 327 (emphasis added).

Similarly, in *Young v. Simpson,* 21 Colo. 460, 42 P. 666 (1895), the court stated:

The principal object of the rules of procedure prescribed by statute for conducting an election is to protect the voter in his constitutional right to vote in secret; to prevent fraud in balloting and secure a fair count. Such rules are usually held to be directory, as distinguished from mandatory; *and unless the statute declares that a strict compliance is essential, in order to have the ballot counted, the courts will not undertake to disenfranchise any voter by rejecting his ballot, where his choice can be gathered from the ballot when viewed in the light of the circumstances surrounding the election.*

21 Colo. at 462, 42 P. at 667 (emphasis added). Relying upon the above expressions of the law, the court in *Nicholls v. Barrick,* 27 Colo. 432, 62 P. 202 (1900), declared that, "[O]ur construction of the statute is, that if a ballot is substantially marked as the law requires, and from such marking the intention of the voter can be ascertained, the ballot is legal, and should be counted." *Id.* at 443, 62 P. at 206. *See also Baldwin v. Wade,* 50 Colo. 109, 114 P. 399 (1911) (applying the above rules of construction to write-in ballots).

■■■■ Moreover, in interpreting sections 1–7–309(3), 1B C.R.S. (1991 Supp.), and 1–7–507(1)(e), 1B C.R.S. (1991 Supp.), we are guided by the principle that statutes must be construed in such manner as to avoid potential constitutional difficulties. The presumption of constitutionality accorded all statutes also assumes that the legislative body intends the statutes it adopts to be compatible with constitutional standards. *See* § 2–4–201(1)(a), 1B C.R.S. (1980) ("In enacting a statute, it is presumed that ... [c]ompliance with the constitutions of the state of Colorado and the United States is intended...."); *Le Manufacture Francaise Des Pneumatiques Michelin v. District Court,* 620 P.2d 1040, 1044 (Colo.1980) (legislature did not intend that long-arm statute be construed so as to violate due process of law). Such principles are particularly important in this case, where we must give effect to the language and purpose of statutory provisions ostensibly placing limitations on the ability of registered voters to exercise their fundamental right to cast their ballots in elections.

In our view, a rule of strict compliance might well cause the two statutes in question, as applied, to unreasonably burden a voter's right to cast a vote, even under the Supreme Court's less stringent standard of review of state election laws. *See Burdick,* — U.S. at —, 112 S.Ct. at 2063–64. Any argument that strict compliance with sections 1–7–309(3) and 1–7–507(1)(e), 1B C.R.S. (1980 & 1991 Supp.), is necessary to serve the state's "important regulatory interests" is fatally undercut by the repeal and reenactment with amendments of these sections in 1992, eliminating the requirement that a write-in vote contain a first name or initial or nickname in addition to the candidate's last name. *See supra* notes 4 & 5.

■■■■ In these circumstances, a substantial compliance test affords the appropriate means of analysis. In applying this standard, it is important to recognize the obvious purpose of sections 1–7–309(3) and 1–7–507(1)(e), 1B C.R.S. (1980 & 1991 Supp.), which was to ensure that the person for whom a write-in vote was cast could be clearly identified before the vote could be credited to that person. If the intent of the voter to vote for a particular write-in candidate is clear, however, the voter's ballot should not be rejected merely because it is not in strict compliance with the above statutes. *Moran,* 775 P.2d at 1180.

■ The district court properly considered evidence extrinsic to the ballots in ascertaining the voter's intent. *See, e.g., Gulino v. Cerny,* 13 Ill.2d 244, 148 N.E.2d 724, 726 (1958) (circumstances attending an election may be considered in ascertaining intent of voter); *Beck v. Cousins,* 252 Iowa 194, 106 N.W.2d 584, 586 (1960) (extraneous evidence admissible to determine whether ballot expresses true intent of voter); *Dupin v. Sullivan,* 355 S.W.2d 676, 678 (Ky.1962) (circumstances attending election may be considered in ascertaining voter's intention or in explaining imperfections in ballots); *Petition of Fifteen Registered Voters,* 129 N.J.Super. 296, 323 A.2d 521, 523 (App.Div.1974) (while there must be expression of voter's intent on the ballot, the ballot is to be read in the light of surrounding circumstances, evidence of which is admissible).

## B

■ Under the test of substantial compliance, and considering the circumstances surrounding the election for District 13, we agree that write-in votes for "Lamm," "Ms. Lamm," "Miss Lamm," or "Mrs. Lamm" should be counted for Peggy Lamm. The evidence adduced at the hearing indicated that Peggy Lamm was the only person in District 13 that had campaigned as a write-in candidate for representative. She was the only person who had filed the requisite affidavit of intent to run and was thus the only person other than Drew Clark eligible to be elected to the office. There was evidence that Lamm's campaign was extensive and vigorous and that she had obtained the editorial endorsement of a number of newspapers in the metropolitan area. Given these facts, as well as the absence of any official instructions to voters that a valid write-in vote must contain more than a last name, we find that the intention of these voters to vote for Peggy Lamm can be ascertained with the requisite certainty.

Our holding is consistent with the case law in other jurisdictions. *See, e.g., Gulino,* 148 N.E.2d at 726 (ballots containing last name only of write-in candidate without first name or middle initial were correctly counted for such person who was the only candidate of that name known to be running); *Beck,* 106 N.W.2d at 588 (ballots on which last name of write-in candidate for mayor was written were valid and should have been counted for such candidate, since candidate and his wife were only persons with this last name in town and candidate had engaged in multiplicity of activities to bring his candidacy before the public); *McIntosh v. Helton,* 828 S.W.2d 364, 366 (Ky.1992) (write-in votes for candidate to office of road commissioner could be counted for him even though they designated him only by initials rather than name as statute governing write-in votes required; election commission had given approval to use of initials and only one person with initials in question had campaigned for position); *Dupin,* 355 S.W.2d at 678 (write-in votes using candidates' surnames only were cast for particular persons in question even though others with the same surname lived in the election precinct, where these particular persons were the only active candidates with those surnames and their candidacy had been well publicized); *Petrie v. Curtis,* 387 Mich. 436, 196 N.W.2d 761, 763 (1972) (where write-in candidate's campaign had been well-publicized and he had uncommon name, ballots containing candidate's last name, but which did not contain candidate's first name, should be counted for such candidate); *Petition of Fifteen Registered Voters,* 323 A.2d at 524 (write-in votes cast for "Wright" or "Mr. Wright" should have been counted for write-in candidate Harry C. Wright; there was no suggestion in record that any person with the surname "Wright" sought office or authorized candidacy, and Harry C. Wright campaigned vigorously for the write-in vote); *Carbery v. Carbery,* 131 Misc.2d 727, 501 N.Y.S.2d 981, 984 (1986) (votes cast for write-in candidates on blank emergency ballots which used only surnames of candidates, or used incorrect given name with surname, should have been counted in canvass and recanvass where the circumstances surrounding the election made it clear that the voters casting such ballots intended to vote for the write-in candidates). *See generally* An-

notation, *Validity of write-in vote where candidate's surname only is written in on ballot,* 86 A.L.R.2d 1025 (1962).

C

■ We also agree with the district court's conclusion that none of the write-in votes for "Lamm" which contained an incorrect first name or initial should be counted for Peggy Lamm. In applying the substantial compliance standard, the purpose of sections 1–7–309(3) and 1–7–507(1)(e), 1B C.R.S. (1980 & 1991 Supp.), to assure correct identification of the person for whom a write-in vote was cast, must be kept firmly in mind.

We conclude that names such as "B. Lamm" or "Nancy Lamm" do not sufficiently demonstrate the voter's intent to vote for Peggy Lamm. *See Devine,* 268 N.W.2d at 628 (ballots containing last name "Devine" but containing an incorrect first name or initial were properly rejected as voters' intent was not adequately shown for variations in given name and the variations were not similar to candidate's true name). As the trial judge correctly noted, to hypothesize the reason for such inconsistencies draws us too far into the realm of speculation to meet the standard of substantial compliance. To indulge in such speculation subverts the constitutionally recognized power of the General Assembly to pass legislation "to secure the purity of elections." Colo. Const. art. VII, § 11.

D

■ We also affirm that part of the district court's ruling which found that write-in votes for Lamm should be counted only if written in the line intended for the write-in vote (which was directly beneath the line containing Drew Clark's name), or the line immediately below that line. Placement of the name "Peggy Lamm" any place else on the ballot might show an intent to vote for Peggy Lamm, but would not show, to a reasonable certainty, the voter's intent to vote for Peggy Lamm for representative from District 13, rather than senator, District Attorney, RTD Director, County Commissioner, Supreme Court Jus-

tice, or Court of Appeals Judge. All of the above offices were listed on the same page of the ballot as representative from District 13.

E

■ Finally, we affirm the district court's ruling with respect to overvotes, with one exception. As the secretary of state has conceded, ballots reflecting a vote for Peggy Lamm, and a vote for Drew Clark that had been scratched out, are not invalid overvotes, and should be counted for Peggy Lamm because the intent of the voter to vote for Lamm can be reasonably ascertained.

IV

Accordingly, the judgment of the district court is affirmed in part and reversed in part. The stay entered by the district court is dissolved. We remand the case to the district court with directions to order the county clerk and recorder to count the ballots cast in the race for House District 13 in conformity with the views expressed in this opinion and to transmit the certified results to the secretary of state.

VOLLACK, J., specially concurs in part and dissents in part.

Justice VOLLACK specially concurring in part and dissenting in part:

The majority concludes that, in interpreting sections 1–7–309(3), 1B C.R.S. (1991 Supp.), and 1–7–507(1)(e), 1B C.R.S. (1991 Supp.), "a substantial compliance test affords the appropriate means of analysis." Op. at 876. I disagree. Application of well settled rules of statutory construction reveals that both sections impose mandatory requirements regarding write-in ballots. §§ 1–7–309(3), 1–7–507(1)(e), 1B C.R.S. (1980 & 1991 Supp.). I dissent, and would reverse that portion of the district court's ruling addressing the vote count.

I.

We are called on to determine whether the district court properly construed sec-

tions 1–7–309(3) and 1–7–507(1)(e). Those sections provide as follows:

**1–7–309. Determination of defective ballots.**

. . . .

(3) No cross mark (X) shall be required to the right of the name of any candidate written in by a voter. Each write-in vote *shall include a reasonably correct spelling of the last name and the given name or the initial or the nickname and the last name* of the candidate for whom the vote is intended.

**1–7–507. Electronic vote-counting—procedure.**

(1) . . . .

(e) No ballot without the official endorsement, except as provided in section 1–6–408, shall be allowed to be deposited in the ballot box, and no ballot shall be counted unless it is provided in accordance with the provisions of this code. Each write-in vote *shall include a reasonably correct spelling of a given name or an initial or nickname and the last name of the person* for whom the vote is intended. Ballots not counted shall be marked "defective" on the back thereof and shall be preserved by the county clerk and recorder pursuant to section 1–7–701.

§ 1–7–309(3), § 1–7–507(1)(e), 1B C.R.S. (1991 Supp.) (emphasis added).[1] Relying on *Erickson v. Blair*, 670 P.2d 749 (Colo. 1983), and on *Moran v. Carlstrom*, 775 P.2d 1176 (Colo.1989), the majority finds that application of a substantial compliance rule "appropriately protects the right to vote against unnecessary and unreasonable governmental restriction."[2] Op. at 875. I find that neither *Erickson* nor *Moran* provide the appropriate framework for the

task of statutory construction that we are required to perform in the present case. However, if *Erickson* and *Moran* did govern the instant dispute, I do not believe that they support the application of a substantial compliance standard in this case.

A.

In *Erickson v. Blair*, 670 P.2d 749 (Colo. 1983), we considered whether seven voter affidavits complied with the requirements of section 32–1–821(4), 13 C.R.S. (1973 & 1982 Supp.), in the context of a special district election. *Id.* at 750–51. That section then provided:

The return envelope for the absent voter's ballot shall have printed thereon an affidavit containing a statement of the qualifications for an elector, and it shall contain a space for the person's name, address, and signature, and the date of election. The voter shall sign the affidavit stating that he is an elector of the district and that he has not previously voted at said election.

§ 32–1–821(4), 13 C.R.S. (1973 & 1982 Supp.); *see Erickson*, 670 P.2d at 751. Thus, the statute at issue required that the affidavit attached to an absent voter ballot return envelope contain a certain statement, and a space for the absent voter's name, address, signature, and the date of election. The statute also required voters to sign the affidavit.

We concluded in *Erickson* that two of the seven affidavits were improperly executed on the grounds that one absent voter failed to sign the affidavit and another absent voter provided an address outside of the district. *Id.* at 757. We found that five absent voter affidavits were deficient insofar as the absent voters either failed to

---

1. Section 11 of article VII of the Colorado Constitution confers upon the General Assembly the power to "pass laws to secure the purity of elections, and guard against abuses of the elective franchise." Colo. Const. art. VII, § 11; *see People ex rel. the Attorney General v. The New–Times Publishing Co.*, 35 Colo. 253, 293, 84 P. 912, 925 (1906) ("[T]he constitution of Colorado, in and by article VII thereof, distinctly and in terms confers upon the legislative branch of the government the making of all laws and regulations for the conduct of elections.").

2. The majority also premises its application of a substantial compliance standard on both federal cases and cases from other states. Op. at 874–878. While instructive of general trends, I find that none of these cases provides the framework for resolution of the present dispute because none of the cases cited evaluates those sections of the Colorado Revised Statutes at issue in the present case.

place an "X" in the appropriate box corresponding to a choice in voter qualification categories, or failed to write their address on the appropriate line, or failed to write in the election date. *Id.* at 756–57. We concluded in *Erickson* that the deficiencies did not render the affidavits deficient; the statute at issue in *Erickson*, however, did not expressly require that absent voters so complete the affidavits. The statute only required that space be provided for such information and that the absent voter sign the affidavit. *Id.* at 751. We rejected the ballot accompanied by the unsigned affidavit, and the ballot accompanied by an affidavit listing an address outside of the district. *Id.* at 755.

In *Moran v. Carlstrom,* 775 P.2d 1176 (Colo.1989), this court considered whether four write-in ballots could be counted for one of two candidates in a general election. *Id.* at 1179. We evaluated the validity of the ballots against section 1–7–309, which provided that "a ballot may not be counted '[i]f a voter marks in ink or indelible pencil more names than there are persons to be elected to an office or if for any reason it is impossible to determine the choice of any voter for any office to be filled.' " *Id.* We concluded in *Moran* that a ballot cast by a qualified elector should be rejected only if the elector's intent could not be ascertained with reasonable certainty; the statute at issue in *Moran*, however, did not impose a mandatory requirement. *Id.* at 1180. Rather, the statute at issue invited discretionary evaluation of whether an absent

voter revealed intent with reasonable certainty. *Id.* at 1179. We ultimately rejected the four contested ballots on the ground that the voter's intent could not be ascertained with reasonable certainty because each of the contested ballots selected more names than persons to be elected to a specific district office. *Id.* at 1179–83.

Unlike either *Erickson* or *Moran,* the statutory scheme in the present case does not contain a provision inviting the exercise of discretion. As such, neither case directly controls the present dispute. In both *Erickson* and *Moran,* this court applied statutory schemes that invited the exercise of discretion, and concluded that a substantial compliance standard was appropriate. We rejected ballots that failed to comply with the statutory scheme's requirements and tolerated deficiencies that went, not to choice of candidate, but to matters of form, such as completing voter qualification forms. Thus, if I were to conclude that the cases did govern the instant dispute, I would find that they instruct that substantial compliance is not an appropriate standard to apply where, as in the present case, a voter's choice of candidate is the basis of the alleged write-in ballot deficiency.[3] I conclude, however, that we are constrained to apply the principles of statutory construction to resolve the present dispute.[4]

## B.

"In construing a statute or statutes, 'we seek to determine the intent of the legisla-

---

3. The majority additionally relies on an 1889 case, *Kellogg v. Hickman,* 12 Colo. 256, 21 P. 325 (1889). Op. at 875. I find, however, that reliance on *Kellogg* is not warranted for the same reasons I would decline to rely on *Moran* or *Erickson.* The *Kellogg* court found that (1) forty-eight votes cast on printed pale yellow paper should have been counted where the statute at issue required votes to be cast on plain white paper; (2) thirty votes placed in a sealed ballot box should have been counted regardless of the fact that the judges who counted and tallied the votes failed to sign the tally-lists or poll-books until the day after the election; and (3) twenty-two votes should have been counted where voters provided sufficient evidence of their residence by testimony at trial.

4. The majority opines that "we are guided by the principle that statutes must be construed in

such manner as to avoid potential constitutional difficulties. The presumption of constitutionality accorded all statutes also assumes that the legislative body intends the statutes it adopts to be compatible with constitutional standards." Op. at 876. The majority structures its analysis by noting, on the one hand, that the right to vote is fundamental under our constitutional structure, but that, on the other hand, the constitution expressly confers authority to regulate *elections upon the General Assembly.* Op. at 874. By implication, the majority posits that §§ 1–7–309(3) and 1–7–507(1)(e) are unconstitutional in the absence of application of a substantial compliance standard. The district court, however, did not "declare that the statutes are unconstitutional." I am not inclined to address constitutional arguments not briefed by either of the parties.

ture as expressed in the language it selected.'" *Martin v. Montezuma–Cortez Sch. Dist. RE-1*, 841 P.2d 237, 246 (Colo.1992) (quoting *Triad Painting Co. v. Blair*, 812 P.2d 638, 644 (Colo.1991)); *A.B. Hirschfeld Press, Inc. v. City and County of Denver*, 806 P.2d 917, 920 (Colo.1991); *Bloomer v. Board of County Comm'rs*, 799 P.2d 942, 944 (Colo.1990); *People v. Guenther*, 740 P.2d 971, 975 (Colo.1987). " '[A] court should look first to the plain language of the statute,' and words used 'should be given effect according to their plain and ordinary meaning.'" *Martin*, 841 P.2d at 246 (quoting *Farmers Group, Inc. v. Williams*, 805 P.2d 419, 422 (Colo.1991)); *see East Lakewood Sanitation Dist. v. District Court*, 842 P.2d 233, 235 (Colo. 1992) (relying on *Griffin v. S.W. Devanney and Co.*, 775 P.2d 555, 559 (Colo.1989)); *Guenther*, 740 P.2d at 975 (holding that this court looks first to the language of a statute, giving terms their commonly understood and accepted meaning). " 'Where the word "shall" is used in a statute, it is presumed to be mandatory.'"[5] *East Lakewood Sanitation Dist.*, 842 P.2d at 235 (quoting *Sargent Sch. Dist. v. Western Servs., Inc.*, 751 P.2d 56, 60 (Colo.1988)); *Colorado State Bd. of Medical Examiners v. Saddoris*, 825 P.2d 39, 43 (Colo.1992); *Guenther*, 740 P.2d at 975.

In the present case, the statutes at issue each state:

> 1-7-309(3) ... Each write-in vote *shall include a reasonably correct spelling of the last name and the given name or the initial or the nickname and the last name* of the candidate for whom the vote is intended.

1-7-507(1)(e) ... Each write-in vote *shall include a reasonably correct spelling of a given name or an initial or nickname and the last name of the person* for whom the vote is intended. §§ 1-7-309(3), 1-7-507(1)(e), 1B C.R.S. (1980 & 1991 Supp.) (emphasis added). Taken together, these sections mandate that a write-in ballot contain a reasonably correct spelling of a last name, and either a given name, nickname, or initial of the person for whom the vote is intended. Accordingly, to be valid, the statutory scheme requires that a write-in ballot contain some version of "Lamm," and some version of "Margaret" or "Peggy," including either "M" or "P." I disagree with the majority's conclusion that "write-in votes for 'Lamm,' 'Ms. Lamm,' 'Miss Lamm,' or 'Mrs. Lamm' should be counted for Peggy Lamm." Op. at 877.

Relying on case law from other jurisdictions, the majority concludes that "[t]he district court properly considered evidence extrinsic to the ballots in ascertaining the voter's intent." Op. at 877. The statutory scheme at issue, however, neither addresses voter intent nor evidence extrinsic to the ballot. I thus find no need to "indulge in ... speculation [that] subverts the constitutionally recognized power of the General Assembly to pass legislation 'to secure the purity of elections.'" Op. at 878 (quoting Colo. Const. art. VII, § 11).

---

**5.** The majority relies on an 1895 case, *Young v. Simpson*, 21 Colo. 460, 42 P. 666 (1895), as standing for the proposition that this court will not require strict compliance with statutes "unless the statute declares that a strict compliance [standard] is essential." Op. at 876 (quoting *Young*, 21 Colo. at 462, 42 P. at 667). This rationale conflicts with our more current reasoning that the presence of the word "shall" in a statute indicates that a statute's language is mandatory. This court has not previously instructed the General Assembly that it must declare that strict compliance "is essential" prior to our giving a statute a mandatory construction. I am not persuaded that an indication of this court given in 1895 justifies divergence from our otherwise consistent application of rules of statutory construction.