Opinion by JUDGE MILLER
*723 ¶ 1 The appellants/cross-appellees in this case are the Denver Classroom Teachers Association, the Denver Association of Educational Office Professionals, Lloyd Bourdon, Cheryl Myres, and Toni Falcon (collectively, Associations). The appellees/cross-appellants are City and County of Denver School District No. 1 (district) and the City and County of Denver School District No. 1 Board of Education (board) (together, DPS).
¶ 2 Both the Associations and DPS appeal the district court's order granting in part and denying in part the Associations' petition for declaratory, injunctive, and mandamus relief regarding the implementation of the Innovation Schools Act of 2008 (Act), sections 22-32.5-101 to - 111, C.R.S. 2014, during 2011 and 2012. Specifically, the Associations contend that DPS violated the Act by implementing innovation plans at eleven district schools without first obtaining approvals for the plans from the majority of teachers employed at the schools. The court granted relief with respect to just two of the schools and denied any relief with respect to the remaining nine schools. DPS asserts that the district court lacked jurisdiction to entertain the Associations' action, and, alternatively, it challenges that part of the court's order granting relief to the Associations with respect to the two schools.
¶ 3 The interpretation of the specific provisions of the Act at issue is a matter of first impression. We affirm the district court's order with respect to the two schools, though for a different reason than that given by the court, and reverse the remainder of the order.
I. The Innovation Schools Act
¶ 4 In the Act's legislative declarations, the General Assembly recognized
• "the importance of preserving local flexibility by granting to each school district board of education the control of instruction in the schools of the school district";
• the need for educational services to be "tailored to the specific population of students they are intended to serve";
• the need to provide parents with "great opportunity for input" regarding those services; and
• the importance of giving the principal and faculty at each public school "the maximum degree of flexibility possible to determine the most effective and efficient manner in which to meet their students' needs."
§ 22-32.5-102(1)(a)-(c), C.R.S. 2014.
¶ 5 The General Assembly also articulated the following specific purposes of the Act, among others:
(a) To grant to Colorado's school districts and public schools greater ability to meet the educational needs of a diverse and constantly changing student population;
(b) To encourage intentionally diverse approaches to learning and education within individual school districts;
(c) To improve educational performance through greater individual school autonomy and managerial flexibility; [and]
...
(e) To encourage innovation in education by providing local school communities and principals with greater control over levels of staffing, personnel selection and evaluation, scheduling, and educational programming with the goal of achieving improved student achievement....
§ 22-32.5-102(2).
¶ 6 To meet these goals, a public school may submit an "innovation plan" to its local school board for approval. § 22- *724 32.5104(1)(a)-(b), C.R.S. 2014. Each innovation plan must include detailed information concerning, among other things, the school's mission, the innovations contemplated, an explanation of how the innovations would help the school achieve its mission, an estimate of cost savings and increased efficiencies, and a statement of the level of support by school employees, students, parents, and the community. § 22-32.5-104(3) and (4). In addition, each plan must provide evidence of majority consent to the plan by the administrators and teachers employed at each school, and from the school accountability committee (SAC). § 22-32.5-104(3)(f).
¶ 7 If the local school board approves the plan or plans, it may seek designation by the State Board of Education (state board) as a district of innovation on the basis of those plans. § 22-32.5-107(1), C.R.S. 2014. The state board must designate the school district as a district of innovation unless it concludes either that the plan is likely to result in a decrease in academic achievement within its schools or that the plan is not fiscally feasible. § 22-32.5-107(3)(a).
¶ 8 As relevant in this case, approval of an innovation plan by the local school board and the state board has two important consequences. Both of these consequences relieve the innovation school from a number of statutory, regulatory, and contractual restrictions.
¶ 9 First, designation waives the application of "any statutes or rules specified in the school district's innovation plan," with limited enumerated exceptions not relevant here. § 22-32.5-108(1), C.R.S. 2014. Second, following designation by the state board, a secret ballot vote of the members of any collective bargaining unit who are employed at the innovation school is conducted concerning waivers of provisions of their collective bargaining agreement that were identified in the innovation plan as needed to implement the proposed innovations. Those waivers become effective if approved by at least sixty percent of the members. § 22-32.5-109(1)(a)-(b), C.R.S. 2014. Many of the waivers identified in the plans relate to issues of substantial significance to the Associations and their members. Examples include school calendars and schedules and teacher and staff hiring, assignments, evaluations, compensation, and dismissal.
II. Procedural History
¶ 10 The following facts are not disputed.
¶ 11 Fourteen schools submitted innovation plans that were approved and implemented by DPS between 2010 and 2012. The district court grouped the schools into three general categories: existing conversion schools; new conversion schools replacing legacy schools in turnaround status; and new schools. While the parties do not entirely agree with the labels the district court assigned these categories, we conclude that the categories provide a helpful basis for analysis.
(1) Existing conversion schools were already existing schools in which each school retained its original name, identification number, and student and parent population. These schools had been designated by DPS as in "turnaround" or "redesign" status. A school designated as "turnaround" or "redesign" retains its original name, but a new principal is hired who may hire new staff. In Colorado, a school that is failing to meet statewide or district performance targets may either be redesigned or closed. § 22-11210(1)-(2), (5)(a)(V), C.R.S. 2014. The existing conversion schools identified by the district court are McGlone, Green Valley Ranch, and Trevista.
(2) New conversion schools replacing legacy schools in turnaround status consisted of newly formed schools with new names and identification numbers, which were being phased in to replace existing, but failing, turnaround/redesign schools that were still in existence but in the process of being closed at the time the innovation plans were submitted. The new conversion schools were to be located in the same buildings as their corresponding closing schools. At the time the innovation plans for these schools were submitted, each such school had a principal and, in some cases, one or two other administrative employees, but no students, faculty, or other employees. The new conversion schools are Denver Center for International Studies at Montbello, Collegiate Prep at Montbello, Denver Center for International *725 Studies at Ford, Noel Community Arts, West Generation, and West Leadership.
(3) New schools were newly established and located in buildings that did not house existing schools at the time they submitted their innovation plans. Each also had only a principal and one or two other administrators, but no students, faculty, or other employees. None of these schools replaced any existing school or student and parent population. The new schools included High Tech, Vista, 21st Century Learning at Wyman (DC-21), Swigert, and McAuliffe.[1]
¶ 12 The Associations brought suit for declaratory and injunctive relief pursuant to C.R.C.P. 106(a)(2), C.R.C.P. 57, and C.R.C.P. 65(a). The amended complaint alleged that the board is a governmental body, that the district is an officer or person under C.R.C.P. 106(a)(2), and that they had failed to perform their duties under the law when they created innovation plans and granted innovation designations to the fourteen schools without complying with the provisions of sections 22-32.5-104(3)(f) and 22-32.5109(1)(b). Specifically, the Associations alleged that DPS had failed to (1) include evidence in each plan that a majority of administrators, teachers, and the SAC at the school had consented to the creation of the innovation school and (2) obtain the approval to waive one or more provisions of the collective bargaining agreement, by means of a secret ballot vote, of sixty percent of the members of the collective bargaining unit employed at each school. The Associations sought, among other things, a declaratory judgment stating that DPS and the school board had violated the Act when they failed to obtain the approvals and votes, and an injunction barring (1) the designation of innovation schools without the necessary approvals and votes and (2) the approval of any further innovation schools without complying with the statutory provisions.
¶ 13 Following a hearing, the district court issued an Amended Final Order (Final Order) denying the Associations' request for relief as to the existing conversion schools, the new conversion schools replacing legacy schools in turnaround status, and three of the new schools. It issued an injunction with regard to two of the new schools (Swigert and McAuliffe) ordering a task force comprised of the "principals, teachers, parents, and community leaders" at each of these schools to review each school's innovation plan and determine if each such plan should be modified. The modified plans-or, if not modified, the original plans-would then be submitted to the teachers, administrators, and SACs at those schools for majority approval and secret ballot vote. Upon obtaining these approvals, the plans would then be resubmitted to the board and the state board by the end of the 2013-14 school year.
¶ 14 The issues have narrowed in two important respects on appeal. First, the Associations do not appeal the district court's determination that the three existing conversion schools were properly designated as innovation schools. That leaves the six new conversion schools and the five new schools[2] still at issue. Second, the Associations do not challenge the secret ballot votes on the waivers of the collective bargaining agreements taken after designation at the remaining eleven innovation schools. They nonetheless contend that the votes should never have been taken because the required majority consents of teachers were not obtained before approvals of the innovation plans by the board and the state board.
III. Jurisdiction
¶ 15 As a threshold matter, we reject DPS's contention that the district court lacked subject matter jurisdiction to consider the Associations' request for mandamus relief.
¶ 16 "[S]ubject matter jurisdiction concerns the court's authority to deal with the class of cases in which it renders judgment, not its authority to enter a particular judgment in that class." Minto v. Lambert, 870 P.2d 572, 575 (Colo. App. 1993). "Whether a court possesses such jurisdiction *726 is generally only dependent on the nature of the claim and the relief sought." Trans Shuttle, Inc. v. Pub. Utils. Comm'n, 58 P.3d 47, 50 (Colo. 2002) ; accord In re Marriage of Stroud, 631 P.2d 168, 171 (Colo. 1981) ; In re Estate of Murphy, 195 P.3d 1147, 1150 (Colo. App. 2008). Our supreme court has explained that "[i]t is the authority to decide a case, not the correctness of the decision, which makes up jurisdiction." Paine, Webb er, Jackson & Curtis, Inc., v. Adams, 718 P.2d 508, 513 (Colo. 1986). Thus, "in determining whether a court has subject matter jurisdiction, it is important to distinguish between cases in which a court is devoid of power and those in which a court may have inappropriately exercised its power." SR Condos., LLC v. K.C. Constr., Inc., 176 P.3d 866, 869-70 (Colo. App. 2007).
¶ 17 The district courts are courts of general jurisdiction, and Article VI, Section 9 of the Colorado Constitution confers on them " 'unrestricted and sweeping jurisdictional powers in the absence of limiting legislation,' " which must be explicit. Bd. of Cnty. Comm'rs v. Cnty. Rd. Users Ass'n, 11 P.3d 432, 439 (Colo. 2000) (quoting Meyer v. Lamm, 846 P.2d 862, 869 (Colo. 1993) ). Their jurisdiction extends to ensuring compliance with statutory requirements. See id.
¶ 18 C.R.C.P. 106(a)(2) authorizes district courts to grant relief in the nature of mandamus to compel a public officer to perform an act required by law. See id. at 437 ; Hansen v. Long, 166 P.3d 248, 250 (Colo. App. 2007). Mandamus is an extraordinary remedy and may be granted only upon satisfaction of a three-part test: (1) the plaintiff must have a clear right to the relief sought; (2) the defendant must have a clear duty to perform the act requested; and (3) there must be no other available remedy. Cnty. Rd. Users, 11 P.3d at 437. Mandamus is available to "compel the performance of a purely ministerial duty involving no discretionary right and not requiring the exercise of judgment." Id.
¶ 19 DPS contends that the Associations failed to meet the three requirements for mandamus relief under C.R.C.P. 106(a)(2), and therefore the district court lacked jurisdiction. But any such failure does not suggest that the district court lacked authority over this case or the class of cases in which it belongs. To the contrary, C.R.C.P. 106(a)(2) specifically authorizes district courts to consider whether to compel a governmental body, board, or officer to perform a duty required of it by law.
¶ 20 A comparison of Hansen, 166 P.3d at 251, and this case illustrates the distinction between the questions whether a court has the power (jurisdiction) to entertain or decide a case and whether the court has properly exercised its power. In Hansen, an inmate in a federal prison in Colorado sought mandamus relief in a Colorado district court compelling a federal prison official to provide him with notary services. A division of this court upheld the district court's dismissal of the complaint for lack of subject matter jurisdiction, noting that " 'it has been clear since 1821 that a state court cannot issue a writ of mandamus against a federal officer.' " Id. at 251 (quoting 17A Charles Alan Wright et al., Federal Practice & Procedure § 4213, at 46 (3d ed. 2007) ). Because the district court lacked subject matter jurisdiction, it had no authority to consider the three-part substantive test for mandamus.
¶ 21 In this case, however, the district court clearly had subject matter jurisdiction over a C.R.C.P. 106(a)(2) action against the district and the board, both creatures of Colorado law, to compel them to perform a state statutory duty. The parties' dispute thus does not implicate the court's subject matter jurisdiction; rather, it relates to whether the Associations have established the elements of their claim for mandamus against those state governmental entities. For this reason, the district court had the authority to consider the merits of the Associations' claims.
¶ 22 We turn then to application of the three-part test set forth in County Road Users . We first take up the third prerequisite-that there be no other available remedy-and then consider together whether the Associations have a clear right to the relief sought and whether DPS had a clear duty to provide evidence of the majority consents and level of support before submitting the innovation plans.
*727 IV. No Other Available Remedy
¶ 23 DPS contends that the Associations had another available remedy under the Administrative Procedure Act, section 24-4-106, C.R.S. 2014, and failed to exhaust it.[3] We disagree.
¶ 24 Section 24-4-106 generally provides for judicial review in the district court of final agency actions. A petition for such review must be filed within thirty-five days of the effective date of the agency action. § 24-4-106(4). In this case, however, the final agency action alleged by DPS was the state board's approval of the respective innovation plans. The state board's review was limited in scope by section 22-32.5-107(3)(a) to determining whether an innovation plan is likely to result in a decrease in academic achievement within the innovation school and whether it is fiscally feasible. Nothing in the Act authorizes the state board to deny designation for any other reason. Thus, even if we assume without deciding that the state board's approvals of the innovation plans were final agency actions for purposes of judicial review, the Associations could not have challenged the innovation plans on the grounds relied on in the district court or on appeal.
¶ 25 Accordingly, the Associations were not required to seek judicial review of the state board's designations before seeking mandamus relief.
V. Clear Right to Relief and Clear Duty
¶ 26 To determine whether the Associations had a clear right to relief and whether DPS and the board had a clear duty to obtain evidence of approval from teachers, staff, and SACs regarding the innovation plans under the circumstances of this case, we must consider whether the applicable provisions of the Act give rise to such a right to relief or to such a duty. We conclude that they do.
A. Preliminary Matters
¶ 27 As an initial matter, we note that these two prerequisites substantially mirror each other. For example, if DPS does not have a clear duty, then the Associations do not have a clear right. DPS does not contend that the Associations are not appropriate parties to seek the relief they are requesting, but it does contend that they may not obtain that relief because they are not entitled to it on the merits, a point to which we turn shortly.
¶ 28 Before doing so, however, we address DPS's contention that mandamus is not available when the defendant has already acted. The flaw with this argument lies in its premise: the Associations' specific complaint is that DPS did not act because it failed to obtain the required majority consents of the schools' teachers before submitting the innovation plans. The Associations therefore brought the mandamus proceeding to compel DPS to perform this statutory duty under section 22-32.5-104(1)(f).
¶ 29 Second, even assuming, as DPS contends, it acted within the meaning of C.R.C.P. 106(a)(2), its argument ignores additional language in the rule. As explained in Green v. Board of Directors of Lutheran Medical Center, 739 P.2d 872, 874 (Colo. App. 1987), that language provides that mandamus is also available when a person is denied "the use and enjoyment of a right or office to which he is entitled and from which he is unlawfully precluded by [a] ... governmental body, corporation, board, officer, or person." The Associations contend that DPS unlawfully denied their members who had taught at the eleven schools their statutory right to grant or withhold their consent to the innovation plans at issue. The allegation that DPS obtained the designations of those schools as innovation schools without obtaining the necessary consents, as required by the Act, falls within that language.
¶ 30 The cases relied on by DPS are distinguishable. Sheeley v. Board of County Commissioners, 137 Colo. 350, 352, 325 P.2d 275, 277 (1958), focused only on the failure-to-act language and did not address whether the *728 plaintiff in that case was unlawfully precluded by the board of county commissioners from the use and enjoyment of a statutory right to which he was entitled.
¶ 31 Green is distinguishable on two grounds. First, it involved a private hospital board, rather than a governmental board. Second, the alleged statutory duty in that case was the failure to grant the petitioners medical staff privileges, a matter solely within the discretion of the private hospital's managing authorities. Id . at 874. Thus, the petitioners failed to establish that they had a clear right to the relief sought. Id.
¶ 32 We next turn to the Associations' contention that their members were precluded from the enjoyment of their right to consent or withhold consent from the innovation plans before their submission.
B. Statutory Construction
¶ 33 We review issues of statutory construction de novo. See Gagne v. Gagne, 2014 COA 127, ¶ 25, 338 P.3d 1152. In interpreting a statute, our primary objective is to ascertain and effectuate the intent of the General Assembly. Specialty Rests. Corp. v. Nelson, 231 P.3d 393, 397 (Colo. 2010). "If the statutory language is clear, we interpret the statute according to its plain and ordinary meaning." Id. We read words and phrases in context and construe them according to their common usages. Gagne, ¶ 25.
¶ 34 We must also interpret a statute in a way that best effectuates the purpose of the legislative scheme. Id. at ¶ 26. When a court construes a statute, it should read and consider the statute as a whole and interpret it in a manner giving consistent, harmonious, and sensible effect to all of its parts. Id. In doing so, a court should not interpret the statute so as to render any part of it either meaningless or absurd. Id.
¶ 35 If a statute is unambiguous, we look no further. Id. at ¶ 27.
C. Subsubsection 104(3)(f)
¶ 36 The Associations focus on the need for consent to an innovation plan by a majority of teachers employed at a school and that evidence of such support be set forth in the plan before it is submitted to the local school board and state board. Such majority support is clearly mandated by section 22-32.5-104(3)(f).
¶ 37 The same subsection also requires evidence of consent of "a majority of the school accountability committee for the public school." Id . The SAC consists of, in addition to the principal, at least
• one teacher "who provides instruction at the school";
• three parents or guardians of "students enrolled in the school";
• "one adult member of an organization of parents, teachers, and students recognized by the school"; and
• "one person from the community."
§ 22-11-401(1)(a), C.R.S. 2014. Clearly, a "school" that has no teachers, enrolled students, or parents of enrolled students cannot form a SAC.
¶ 38 The six new conversion schools and the five new schools were unable to, and did not, provide the required evidence of consents and support in their innovation plans. They obtained majority approvals from teachers, administrators, and SACs only after the innovation plans were approved by the state board. When the innovation plans were submitted to the DPS, the schools each employed a principal and, in some cases, one or two other administrators, but no teachers and no staff. The innovation plans for these schools instead represented that faculty and staff would at a later date demonstrate their support by choosing to work at the schools. Offer letters to prospective teachers and staff explained the terms of the innovation plans as well as the waivers that would be requested of the staff. Secret ballot votes on the collective bargaining agreement waivers were conducted pursuant to section 22-32.5-109(1)(b) at each of the eleven schools and garnered the required sixty percent approvals, but these votes necessarily took place after submission and approval of the defective plans.
¶ 39 We next apply subsubsection 104(3)(f) to the two categories of schools at issue on appeal, the "new conversion schools" and the "new schools."
*729 D. The New Conversion Schools
¶ 40 The district court held that Colorado law allows a "new conversion school" to seek innovation status and adopt an innovation plan without pre-submission majority approval of the teachers, administrators, and the SAC for that school. The district court further found that the teachers demonstrated their approval of the plans by agreeing to work at the schools and signing employment contracts at the schools with knowledge of the terms of the innovation plans. We disagree with the district court's construction of the approval requirement.
¶ 41 Subsection 104(3)(f) unambiguously requires that an innovation plan include evidence of approval from administrators and teachers "employed at the public school" and from the SAC, the composition of which assumes that students are enrolled and teachers are providing instruction. DPS contends that the General Assembly intended that under the circumstances presented here a new school is exempt from these pre-submission approval requirements.
¶ 42 There are at least two problems with this construction. First, it nullifies the unambiguous language of the statute, which requires inclusion of evidence of majority consent of the teachers, administrators, and SAC in the innovation plan that is submitted to the local school board and the state board. Some of the DPS plans provided evidence of support from parents of potential students and from community groups; some did not. None of the plans, however, provided evidence of majority[4] support from teachers employed at the school or the school's SAC.
¶ 43 Courts should not interpret a statute to mean what it does not express or add words that it does not contain. See, e.g., Tatum v. Basin Res., Inc., 141 P.3d 863, 879 (Colo. App. 2005). If the General Assembly had wanted to exclude the majority consent requirement when a new school seeks innovation status, it could easily have said so. In the absence of such a statutory exception, we must follow the language used.
¶ 44 Second, DPS's approach is inconsistent with the declarations in section 22-32.5-102(1)(b) and (c) calling for (1) the faculty employed at a school to "have the maximum degree of flexibility possible to determine the most effective and efficient manner in which to meet their students' needs" and (2) giving parents "great opportunity for input regarding the educational services their children receive," for example, by including representative parents on the SAC which must consent to the plan. If the statutory scheme spelled out in subsection 104(3)(f) is not followed, teachers and parents have no opportunity for input; they can only agree or not agree to teach at or have their child attend a school for which the innovation plan has already been finalized.
¶ 45 Accordingly, we conclude that a public school or school district cannot develop an innovation plan without complying with the pre-submission majority consent requirement set forth in subsection 104(3)(f).
¶ 46 DPS, however, makes two other arguments to support its position. First, it contends that obtaining majority consent after an innovation plan has been approved constitutes substantial compliance with the statutory requirements. We agree with DPS that where the purposes of a statutory requirement are satisfied, substantial, rather than strict or absolute, compliance may be sufficient. See Finnie v. Jefferson Cnty. Sch. Dist. R-1, 79 P.3d 1253, 1257-58 (Colo. 2003) ; Meyer, 846 P.2d at 876 ; Woodsmall v. Reg'l Transp. Dist., 800 P.2d 63, 67-68 (Colo. 1990).
¶ 47 The difficulty here is that the plain language of subsection 104(3)(f) and of the Act's declarations in subsection 102(1)(b) and (c) make clear that the purposes of the advance consent requirement are to assure that (1) parents have great opportunity for input into the educational services provided at the *730 school and (2) teachers have the maximum degree of flexibility in determining the most efficient and effective means of providing those services. When teachers and parents are deprived of the opportunity to provide such input until after the plans have already been designed, submitted, and approved, the statutory purposes are frustrated.
¶ 48 Thus, this case is unlike Meyer, relied on by DPS, in which substantial compliance with the election laws was found where write-in voters cast ballots for "Lamm" for state representative rather than "Peggy Lamm." The purpose of the statute was to ensure that the person for whom a write-in vote was cast could be clearly identified. 846 P.2d at 876. That purpose was accomplished where write-in votes for "Lamm" were counted for Peggy Lamm, the only person in the legislative district eligible for election as a write-in candidate. Id . at 877 ; see also Finnie, 79 P.3d at 1257-58 (substantial compliance with service of notice to sue under the Colorado Governmental Immunity Act possible where the purposes of the statute-avoiding prejudice to the governmental entity, encouraging settlement, and providing it the opportunity to investigate claims, remedy conditions, and prepare a defense to the claims-are satisfied); Woodsmall, 800 P.2d at 67-68 (same).
¶ 49 In this case, however, DPS has failed to show how the Act's objectives of obtaining teacher and parent input can be satisfied where teacher and SAC consent are not obtained before the design and approval of the innovation plan. Where teachers and parents "buy in" after the fact, it is on a take-it or leave-it basis. Many teachers and parents might at that point nonetheless approve of and even be enthusiastic about an innovation plan developed without their participation, but that is not the same as providing input into the design of the plan or "determin[ing] the most effective and efficient manner in which to meet ... student's needs." § 22-32.5-102(1)(c). We therefore conclude that DPS did not establish substantial compliance.
¶ 50 The Associations also argue that, although subsection 104(3) provides that innovation plans "shall" include evidence of the majority consents, this language is merely "directory" and not "mandatory." The use of the term "shall" in a statute "is usually deemed to involve a mandatory connotation." People v. Dist. Court, 713 P.2d 918, 921 (Colo. 1986) ; see DiMarco v. Dep't of Revenue, 857 P.2d 1349, 1352 (Colo. 1993) ("Unless the context indicates otherwise, the word 'shall' generally indicates that the General Assembly intended the provision to be mandatory."). Our supreme court has recently reaffirmed that while "there is no bright-line test or formalistic rule of grammar by which to distinguish mandatory provisions from those that are merely directory[;] ... legislative intent controls." Protest of McKenna, 2015 CO 23, ¶ 19, 346 P.3d 35 (internal quotation marks and citations omitted); see DiMarco, 857 P.2d at 1351.
¶ 51 We perceive no intent that subsection 104(3)'s requirements are other than mandatory. As already discussed, subsections 102(1) and 104(3)(f) express the General Assembly's intent to ensure that teachers and parents, among others, have input into innovation plans before they are submitted for approval. If subsection 104(3)(f) is not mandatory in nature, then the objective of providing such up-front input is frustrated. Further, subsection 104(3) says that "[e]ach innovation plan" shall meet the consent and report requirements (emphasis added). That language brooks no exceptions. See Hudgeons v. Tenneco Oil Co., 796 P.2d 21, 23 (Colo. App. 1990) (the word "all" is synonymous with "every" and "each"); see also Webster's Third New International Dictionary 713 (2002).[5]
¶ 52 We accordingly conclude that the majority consent provision is mandatory and not directory.
E. The New Schools
¶ 53 With respect to the schools categorized as new schools, the district court concluded that the innovation plans for *731 three-High Tech, Vista, and DC-21-were adopted in compliance with the Act for the same reasons given for the new conversion schools. The court held, however, that the Act does not apply to Swigert and McAuliffe. It nonetheless ordered establishment of task forces at each of these schools, comprised of principals, teachers, parents, and community leaders, to review the respective innovation plans and determine whether any modifications should be made. The modified or unmodified plans were then to be submitted to the teachers and administrators employed at the schools and the SACs for majority approval, with secret ballot votes to follow, and then resubmitted to the DPS and state boards for approval.
¶ 54 We conclude, for the reasons discussed in Part V.D., that the innovation plans for High Tech, Vista, and DC-21 did not comply with the Act. Like the plans for the new conversion schools, the plans for these three schools did not contain evidence of majority consent by the teachers, administrators, or SACs.
¶ 55 In a rare instance of consensus, both parties assert that the district court erred in holding that the Act does not apply to Swigert and McAuliffe because they were created in response to student population growth in the Stapleton neighborhood, rather than to address problems in a failing school or failing student population. The court ruled that no evidence was presented at trial that students in the Stapleton neighborhood schools were failing and, therefore, that application of the Act to Swigert and McAuliffe would not serve the legislative purposes or intent of the Act.
¶ 56 We agree that the district court erred in making this ruling. Nothing in the statutory language requires that a school be in "turnaround" status, "redesign" status, or "chronically failing" to be eligible for application of the Act's provisions. Indeed, those terms do not appear in the Act.
¶ 57 The district court apparently reached its conclusion by relying on a provision in the Education Accountability Act of 2009 (EAA), sections 22-11-101 to - 605, C.R.S. 2014, which authorizes the state review panel created pursuant to section 22-11-205, C.R.S. 2014, to recommend, as one possible strategy, that a school failing to make adequate progress under a turnaround plan be granted innovation school status. § 22-11-301(5)(a)(IV), C.R.S. 2014. However, neither the EAA nor the Act requires that a school or its students must be failing academically before the school may seek innovation status.
¶ 58 Because the statutory language is unambiguous, we decline to consider other evidence such as after-the-fact trial testimony from lawmakers and others involved in the passage of the Act. See Gagne, ¶ 27.
¶ 59 Accordingly, the district court erred when it concluded the Act could not apply to new schools in neighborhoods where schools are not failing academically. However, because the innovation plans for these two schools, like those for the new conversion schools, did not include evidence of majority consent by teachers, administrators, and SACs, we conclude that the district court did not err in declining to recognize the validity of the designations of these schools as innovation schools.
¶ 60 Thus, a new school is not ineligible for designation as an innovation school merely because it is not failing and is not replacing a failing school. A new school's innovation plan, however, cannot meet the requirements of subsection 104 of the Act until the school has commenced operations and its plan has received the necessary majority consents from teachers and administrators employed at the school and from the school's SAC, which includes parents of students enrolled at the school. As a result, under the statutory scheme, a new school that has neither teachers nor students cannot seek innovation status.
¶ 61 In sum, we conclude that DPS had a clear duty to provide evidence of majority consents from administrators, teachers, and SACs before submitting the innovation plans[6] ; that DPS failed to perform that duty *732 with respect to the eleven schools at issue; and that the Associations have a clear right to relief requiring DPS to perform that duty. The Associations are accordingly entitled to mandamus relief.
VI. Injunctive Relief
¶ 62 We therefore reverse the Final Order in part and remand this case to the district court to issue appropriate remedial orders consistent with this opinion. These orders must include an injunction (1) ordering DPS to resubmit innovation plans for the eleven schools which comply with the requirements of subsection 104(3)(f) and (2) enjoining the approval of any new innovation plans not in compliance with those requirements.
¶ 63 We recognize that "unscrambling the omelet" could pose difficulties for the parties and the district court on remand, given that the innovation plans for most or all of the eleven schools were implemented three or more years ago. However, for two reasons, we reject the Associations' urging that DPS be required at this stage to obtain majority consents and secret ballot votes for the innovation plans from the teachers and administrators formerly employed at the schools that previously occupied the buildings in which the eleven schools now operate. First, most or all of the former employees at those schools have long since dispersed from the former schools. They are unlikely to have detailed familiarity with the operation of the eleven schools or with the current objectives and needs of those schools. In some cases, there is a total disconnect between the former and current schools. For example, it is questionable whether the former teachers and administrators at the old Wyman Elementary School could provide meaningful input into the operation of DC-21, a high school serving dropouts and high-risk youth from throughout the district.
¶ 64 Second, the express language of subsection 104(3)(f) requires majority consents from teachers and administrators "employed" at the schools applying for innovation status. Under the statutory language, therefore, the current faculty, administration, and SACs must consent to any innovation plans the schools or DPS may submit following remand. Those employees are in the best position to provide input and meaningfully determine what should be included in the innovation plans.
¶ 65 We also reject DPS's contention that "equitable considerations ... preclude overturning existing innovation schools that have relied on the designations to serve students. See Zoning Bd. of Adjustment v. DeVilbiss, 729 P.2d 353, 356-59 (Colo. 1986) (citing Kester v. Miami-Yoder Joint Sch. Dist. No. 60, 146 Colo. 230, 361 P.2d 124 (1961) )." Again, we do so for two reasons. First, DPS has failed to identify any such "equitable considerations." Unlike the cases it has cited, where facilities had already been constructed at considerable cost, DPS has not pointed to any capital improvements that have been completed in this case or to any costs to DPS or other consequences of granting the Associations the relief they have requested.
¶ 66 Second, the dire consequences DPS apparently envisions are far from certain. On remand, the district court, after hearing from the parties, will provide a reasonable timetable for DPS to comply with subsection 104(3)(f) as we have construed it. The procedure set forth in the Final Order (and described in Part II above) for evaluating the innovation plans for Swigert and McAuliffe represents one reasonable way of proceeding for the other nine schools, but the district court will be in the best position to evaluate that process, determine remedial procedures, and address issues as they arise. If innovation plans for Swigert and McAuliffe that comply with the requirements of this opinion have already been approved by the board and the state board, there is no need to repeat that process or to address the equitable considerations DPS has raised for those schools. At this stage, we cannot predict whether any insurmountable problems may arise from the process of resubmitting innovation plans for the other nine schools.
*733 ¶ 67 We stress that an injunction is a discretionary equitable remedy, May Dep't Stores Co. v. State ex rel. Woodard, 863 P.2d 967, 978 (Colo. 1993), and that district courts "are vested with broad discretion to formulate the terms of injunctive relief," Stulp v. Schuman, 2012 COA 144, ¶ 17, 410 P.3d 457. On remand, the district court should consider the unique circumstances facing each of the schools in framing the injunctive relief, as well as the disruptions that may be caused by effectuating injunctive relief with respect to a school that has operated as an innovation school for years but for which reasonable efforts to obtain the necessary consents and approvals have failed. Under such circumstances, the district court could provide for the closing of an improperly designated school over a reasonable time frame. If all other remedies for a particular school have been found wanting, the court could consider whether the negative consequences to students, the community, and DPS of closing an innovation school and if the factors set forth in section 22-32.5-102 would render the closing of such a school inequitable.
VII. Conclusion
¶ 68 The judgment is affirmed with respect to Swigert and McAuliffe schools, reversed with respect to the other nine schools, and remanded to the district court for further proceedings consistent with this opinion.
JUDGE J. JONES and JUDGE BERGER concur.

At its opening, McAuliffe was housed in the same building as Swigert. McAuliffe subsequently relocated to a separate building.

DPS cross-appealed the district court's granting of relief with regard to Swigert and McAuliffe.

DPS asserted this issue as a jurisdictional bar. However, in County Road Users, the supreme court analyzed this issue not as a jurisdictional prerequisite, but rather as an essential element that must be satisfied to obtain relief in the nature of mandamus under C.R.C.P. 106(a)(4). Bd. of Cnty. Comm'rs v. Cnty. Rd. Users Ass'n, 11 P.3d 432, 437-40 (Colo. 2000).

Subsection 104(3)(f) is not the only required component of an innovation plan that presumes the existence of an operating school. See § 22-32.5-104(3)(c) (listing of programs and policies that would be affected by the proposed innovations), (d) (identification of anticipated improvements in academic achievement), (e) (estimate of cost savings and increased efficiencies to be achieved), (g) (statement of level of support by other school employees and students enrolled in the school and their parents).

Subsection 104(4) repeats this mandatory language ("[e]ach" and "shall") in setting forth requirements for innovative school zone plans.

While we have respectfully considered the Attorney General's opinion on issues in this case, for the reasons set forth in this opinion, we decline to follow it. See Colo. Common Cause v. Meyer, 758 P.2d 153, 159 (Colo. 1988) (an Attorney General's opinion is entitled to respectful consideration, but a court's resolution of an issue of statutory construction must proceed from an independent analysis of the statutory scheme).